Charles Frank MANUEL, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 22290.

United States Court of Appeals
Fifth Circuit.

Jan. 31, 1966.

Kirby G. Bailey, Atlanta, Ga., for appellant.

Thomas K. McWhorter, Asst. U. S. Atty., Atlanta, Ga., Charles L. Goodson, U. S. Atty., for appellee.

Before BROWN, WISDOM and THORNBERRY, Circuit Judges.

THORNBERRY, Circuit Judge:

This is a forma pauperis appeal from the U. S. District Court for the Northern District of Georgia, where appellant was found guilty by a jury on all counts of a three-count indictment charging the offenses of (a) possessing stolen mail matter, (b) uttering and publishing a Treasury check with a forged signature thereon, and (c) forging the name of the true payee on the Treasury check, in violation of 18 U.S.C. § 1708 and 18 U.S.C. § 495. Appellant received a total sentence of five years to serve.

The subject matter of this appeal is the denial by the trial court of appellant's motion to suppress evidence. After a hearing, the trial court overruled this motion on the grounds that "the officer had probable cause for the arrest, and that any search that may have occurred subsequent to that time and incident to the arrest would not be an illegal search." Also, at the conclusion of the Government's case during the trial, appellant orally moved to suppress all evidence offered by the United States, and this motion was likewise denied.

We hold that these rulings by the trial court were proper, and we therefore affirm the judgment of conviction.

At the hearing prior to trial on appellant's motion to suppress, the testimony produced the following facts: On Sunday, April 5, 1964, between 7:30 and 8:00 P.M., appellant drove up to a service station in Atlanta, went inside, and according to the station attendant, W. H. Cochran, asked to cash a U. S. Treasury check payable to Julia H. Smith. Cochran told him he would have to wait until the station manager returned. Appellant then started to leave the station.

Present inside the station during this time were the attendant's wife and a plain-clothes Atlanta policeman, Detective Hull. Hull's partner, Detective Brown, was outside the station in a car. (Apparently, the presence of police was pure coincidence.)

When appellant started to leave the station, Detective Hull asked to see the check. Hull testified his suspicions were aroused when he noticed that the check was payable to a female and that a male was attempting to cash it. Also, Hull testified that he thought it unusual for a government check to be cashed on the fifth day of the month, since he knew such checks were received on the first through the third of the month. He also thought it unusual to cash a government check on a Sunday.

At this point there is some conflict in the testimony of the various witnesses. The attendant's wife testified that Hull questioned appellant about having a check at that time of the month and that appellant said he had been out on the road. She stated that Hull asked appellant for the check and then both Hull and appellant moved outside the station, out of hearing. She further stated, "After they got the check they started to search him."

Cochran, the attendant, testified that when appellant started to leave the officers asked him for the check and "then they started to scuffling."

Detective Brown testified that he saw from the car a conversation between appellant and Hull. He said he got out of the car when he saw appellant hand Hull a check. Brown also testified that appellant then voluntarily offered up documents of identification which were obviously altered. These documents consisted of a Social Security card and a Georgia vehicle tag registration, both in the name of Julia Smith, and with "female" inserted in the proper blank on the tag registration. There appeared to have been some erasing done in both cards before the name Julia Smith had been written on them. Brown stated that appellant then tried to escape, but Brown and

Hull subdued him and took him to the Atlanta Police Station where he was booked for "suspicion—bad checks."

Detective Hull testified that when he asked appellant for the check, appellant complied voluntarily and then stated that he was in fact Julia Smith. Hull said that he then asked appellant for further identification. Although Hull's testimony on direct examination was unclear as to whether appellant gave him the altered identification before or after he was subdued, on cross-examination Hull testified that appellant did not break and run until after Hull had looked at the identification papers that appellant presented to him in the name of Julia Smith. Hull stated that Brown did not get out of the car until appellant tried to escape, while Brown testified that he was present before appellant broke and ran.

Appellant's version of his arrest was that the arresting officers had framed him by planting the check in the glove compartment of his car. Appellant testified that he knew beforehand that Hull and Brown were Atlanta policemen. Hull said he identified himself as a detective before appellant gave him the check.

On the morning of April 6, 1964, appellant was turned over to R. C. Quinn, of the U. S. Secret Service. Agent Quinn first spoke with appellant at the Atlanta Police Department and testified that he told appellant he was soon going to appear before the U. S. Commissioner, where he would be charged with forging a Government check. Quinn also stated that he advised appellant of his right to remain silent. He asked appellant to give him handwriting specimens and told him he did not have to give him the specimens. Appellant then submitted a limited amount of handwriting.

Agent Quinn then took appellant to his own office in the police building, where he made arrangements to bring him before a U. S. Commissioner later that morning. Before taking appellant before the Commissioner, Quinn talked further with appellant and obtained more handwriting from him after advising him that he did not have to furnish any handwriting. Appellant then was taken before the Commissioner, at about 11:30 A.M. on April 6, 1964.

During the trial of the case, the "Julia Smith" signatures which appeared on the back of the check and on the Georgia vehicle registration card and social security card were identified as the handwriting of appellant.

Appellant's initial contention is that the contradictions in the testimony of the Government witnesses "are of themselves enough to raise a reasonable doubt as to the legality of his arrest, a reasonable doubt that compels a finding that his arrest was illegal."

This contention is without merit. It is true that the burden of persuasion is on the prosecution to establish probable cause for an arrest, once it has been established, as in the instant case, that the arrest was made without a warrant. Rogers v. United States, 5th Cir. 1964, 330 F.2d 535. However, with regard to appellant's contention that the Government must establish probable cause beyond a reasonable doubt, the Supreme Court has recognized that such a requirement would create too heavy a burden on law enforcement officers. Brinegar v. United States, 1949, 338 U.S. 160, 174, 69 S.Ct. 1302, 93 L.Ed. 1879.

While there were conflicts in the testimony, they could be resolved, especially when we view the evidence in the light most favorable to the Government as we are required to do. See United States v. Zimmerman, 7th Cir. 1963, 326 F.2d 1, 3.

Appellant next contends that, when Detective Hull identified himself as a policeman and asked for the check, the arrest of appellant was completed and, therefore, was invalid since at that point in time Hull had no grounds to arrest appellant.

Since the arrest in this case was made by state officers, it is incumbent upon this Court to look to the law of Georgia to determine the validity of the arrest. Collins v. United States, 5th Cir. 1961, 289 F.2d 129; Hart v. United

States, 5th Cir. 1963, 316 F.2d 916. The *Hart* case, which also involved a construction of Georgia law, is quite similar to the instant case. In *Hart*, the defendant was stopped by a Georgia deputy sheriff while walking along a street. Defendant was "asked" to come to the Sheriff's office. The reason given at the hearing was that the defendant was approaching a car which was the same model and color as a stolen car for which the deputy had been notified to be on the lookout. The defendant accompanied the deputy to the Sheriff's office without objection. After questioning by the Sheriff, the defendant went back to the car to get the bill of sale and registration, which he turned over to the deputy without protest. The deputy discovered that the car was improperly registered under state law by examining the car's out-of-state license plate, the registration, the bill of sale and a serial number plated inside the car door. It was unclear whether the deputy opened and searched the car to see the identification plate, but there was "no proof that he did so." Thereafter, he searched the car and found a new Georgia license plate. Appellant was then "formally arrested" for improper state registration, and it was later determined by Federal agents that the car was stolen.

In considering the question of whether the defendant was arrested by the deputy at the time he was first taken to the Sheriff's office, the Court in *Hart* quoted from Ga.Code § 27–207, which provides:

> "An arrest for a crime may be made by an officer, either under a warrant, or without a warrant if the offense is committed in his presence, or the offender is endeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant."

The Court recognized that if it found the defendant's arrest did occur when he was first taken to the Sheriff's office, then the search was clearly illegal since no probable cause existed for an arrest at that time. The following language then appears in the opinion:

> "The question then is whether the accosting of Hart and the invitation to him to 'come see the Sheriff' was an arrest. We conclude that the trial court could find on this record that it was not, and that Hart's conduct in going back to the car and getting his papers and giving them to the Deputy, and the latter's comparison of them with the identification number were all with the consent of the appellant. * * *" Hart v. United States, supra, at 919.

Similarly, in the instant case, we feel that the trial court could find on this record that appellant's handing the check to Detective Hull was done voluntarily and that no arrest had yet occurred.

*Hart* is also ample authority for our conclusion that the trial court could find that the arrest did not occur until after appellant handed over the altered identification papers, since the trial court could properly conclude that appellant *wanted* to turn over the documents to allay suspicion. See Hart v. United States, supra, at 920. This being so, we hold that the altered identification furnished adequate probable cause for appellant's subsequent arrest without a warrant, since under Georgia law an offense (possession of a stolen check) had then been committed in the officers' presence.

The recent Georgia case of Barron v. State, 1964, 109 Ga.App. 786, 137 S.E.2d 690, supports our conclusion. There Georgia police observed the defendant cutting up a relatively new car with an acetylene torch. It was obvious that the serial plate had been removed, since the post door to which the plate was attached had been removed. A Georgia statute makes it a misdemeanor to wilfully remove the identification plate, unless the plate is immediately mailed to the State Revenue Commissioner. In holding that

the offense was committed in the presence of the officers the court said:

"Could it be said *at the time of arrest* (emphasis in the original) that this was a crime because done illegally, that is, not within the exception * * * which allows the owner, if the dismantling is otherwise legally done, to mail in the identification plate after removal. The sort of destruction being carried on is a possible legal act, but *not statistically probable* (emphasis ours) considering the age, condition and location of the vehicle * * * Where all the circumstances surrounding the demolition of the car suggest although they by no means constitute proof that a violation of law was in process, the intent or purpose with which it was done being the only point in doubt, sufficient. cause existed so that the burden shifted to the defendant to show himself within the exception to the criminal statute. That is, the officers arrested at their peril, but the arrest was valid when considered in connection with the other circumstances of this particular case, as what the officers saw and heard by the use of their senses established that the defendant was wilfully removing the motor vehicle identification and justified the belief that he did not intend to send the plate in to the Commissioner. * * * "

Similarly, in the instant case the officers had enough evidence before them after appellant handed over the altered identification to justify their belief that a crime was being committed in their presence. To use the language of the *Barron* case, it was then "not statistically probable" that appellant's activities were legal. See also Phelps v. State, 1962, 106 Ga.App. 132, 126 S.E.2d 429.

Appellant's final contention is that the handwriting specimens taken from him after he was booked on the charge of "suspicion—bad checks" should have been suppressed.

During the trial of the case, Detective Hull testified on cross-examination that the charge of "suspicion—bad checks" was a "technical charge to give the Department time to work out the investigation and get all the details to establish the case before the subject was booked, which was normally the subject was held twenty-four to forty-eight hours." (sic.) The following question and answer then appears in the record:

"Q. I asked you, that suspicion, when you arrest someone on suspicion, if you find someone suspicious you arrest them and hold them until you can investigate and find out exactly what he did wrong, and then book him on the exact charge, or named specified crime?

A. Yes, sir that was what it was."

Appellant's booking was precisely the type of police procedure which this Court has declared unlawful in Collins v. United States, 5th Cir. 1961, 289 F.2d 129, and in Staples v. United States, 5th Cir. 1963, 320 F.2d 817. Such a booking did not charge appellant with the commission of any legally defined crime.

It does not follow, however, that the handwriting samples given to Agent Quinn should have been suppressed, since there is an ingredient present in the instant case which was lacking in both *Collins* and *Staples,* supra. That ingredient is appellant's voluntary furnishing of the specimens after being specifically warned of his right to remain silent and of his right not to furnish any handwriting. Under these circumstances, we agree with what was said in Burke v. United States, 1st Cir. 1964, 328 F.2d 399, cert. denied, 379 U.S. 849, 85 S.Ct. 91, 13 L.Ed.2d 52:

"But not every statement or surrender of property made during an illegal arrest is created inadmissible because of the illegal arrest. '(T)hat fact does not require the rejection of evidence volunteered by [the defendant] for reasons sufficient to himself and made without

force or compulsion or promise of reward.' Gibson v. United States, 80 U.S.App.D.C. 81, 149 F.2d 381, 384 (1945); United States v. Busby, 126 F.Supp. 845 (D.D.C. 1954)."

Affirmed.