David Matthew LATHERS, Appellant,

v.

UNITED STATES of America, Appellee.

No. 24226.

United States Court of Appeals Fifth Circuit.

May 23, 1968.

William Liston, Winona, Miss., for appellant.

Robert E. Hauberg, U. S. Atty., E. Donald Strange, Asst. U. S. Atty., Jackson, Miss., for appellee.

Before RIVES, GOLDBERG and AINSWORTH, Circuit Judges.

GOLDBERG, Circuit Judge:

We consider both the legality of an arrest without a warrant and the *Miranda* caveats, and, while finding no cause to impeach the arrest, we are convinced that *Miranda* precepts were traduced.

David Matthew Lathers, a resident of Arlington, Virginia, was arrested by state officers in Jackson, Mississippi, after attempting to sell a truck which was in his possession and which had been stolen from a used car lot in Washington, D. C. He was convicted in the federal district court under 18 U.S.C. § 2312, for transporting a stolen motor vehicle in interstate commerce. Lathers' substantive defense was as follows: that he had obtained a week's leave from work in Arlington to visit his sister in New Orleans; that while hitchhiking through Tennessee he was offered a ride in the truck previously mentioned; that while spending the night near Tupelo, Mississippi, he lost his belongings when the driver of the truck absconded with them; and that on the following day Lathers drove the truck into Jackson to sell it and recoup his losses.

The jury to the contrary notwithstanding, Lathers beats no retreat from his story of innocence. On appeal, however, he relies primarily on the two evidentiary roadblocks of (1) unlawful arrest and (2) unlawful custodial interrogation.

**(1) Arrest By State Officers Without a Warrant**

On the morning of July 25, 1966, Lathers approached Ben C. Daughtery, a used car dealer in Jackson, Mississippi, and attempted to sell him a 1965 maroon Chevrolet pick-up truck bearing a Virginia license. In 1965 the truck had a listed retail price of $1595, but Daughtery began the bargaining with a low $500 estimate. (Daughtery testified at trial that his true estimate of the truck's worth was $1100.) To Daughtery's surprise, Lathers accepted the estimate and offered the truck for sale without engaging in the customary trading dialogue. Because of Lathers' overeagerness and because he could not prove ownership of the truck, Daughtery sent him to another used car lot and then notified F.B.I. Agent Roy H. McDaniel. McDaniel relayed the information to the Jackson Police Department which issued a bulletin to stop the driver (described in the bulletin) of a 1965 maroon Chevrolet pick-up truck with a Virginia license.[1] Two state police officers spotted Lathers, stopped him, and, after informing him of their suspicions, took him to police headquarters. On the day of his arrest Lathers was interrogated only by state officers. He was interrogated by F.B.I. Agent McDaniel the following day and was prosecuted only in federal court.

Without doubt, the two state police officers arrested Lathers without a warrant and without conclusive proof that

---

1. We gather the content of the bulletin from the testimony of the two arresting officers. One of the two officers testified:

"There had been a bulletin put out in regard to a 1965 Chevrolet Pick-up with a Virginia license as being stolen or suspected stolen and the description of the driver * * *"

The other officer testified:

"We received an all-car broadcast over our patrol car that a 65 maroon pick-up somewhere in South Jackson had tried to sell the truck at too low a price."

a felony had been committed. The police did obtain a report from Washington, D. C., concerning the theft of the truck, but not until the following morning. Lathers contends that we must exclude all evidence obtained as a result of the arrest because the officers did not *know* that a felony had been committed. In the alternative he contends that the police did not even have probable cause for the arrest.

### (a) Mississippi Law

■ To support his first contention, Lathers encourages us to read with a literal eye Section 2470 of the Mississippi Code:

> "2470. Arrests—when made without warrant. An officer or private person may arrest any person without warrant, for an indictable offense committed, or a breach of the peace threatened or attempted in his presence; or when a person has committed a felony, though not in his presence; *or when a felony has been committed, and he has reasonable ground to suspect and believe the person proposed to be arrested to have committed it;* or on a charge, made upon reasonable cause, of the commission of a felony by the party proposed to be arrested. And in all cases of arrests without warrant, the person making such arrest must inform the accused of the object and cause of the arrest, except when he is in the actual commission of the offense, or is arrested on pursuit." (Emphasis added.)

Because Lathers bases his first contention entirely, and most strenuously, on Mississippi jurisprudence, we pause to dispose of this claim on his own battlefield. However, in section (b) *infra* we will move to the appropriate arena of decision.

Lathers construes Section 2470 as requiring absolute knowledge that a felony has been committed. Reasonable grounds, he asserts, are not enough. His interpretation, though having plausible acceptability, does not comply with the following interpretation reached by the Mississippi Supreme Court:

> "An officer without a warrant may arrest a person when he has *reasonable cause to believe that a felony has been committed,* and reasonable cause to believe that such person committed it. These criteria existed here, under Mississippi, Louisiana and federal constitutional law. Miss.Code Ann. § 2470 (1956); La.Rev.Stats. § 15:60 (1950); Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)." (Emphasis added.)

Bradshaw v. State, 1966, Miss., 192 So. 2d 387, 388, cert. den., 1967, 389 U.S. 941, 88 S.Ct. 299, 19 L.Ed.2d 293. See also Nash v. State, 1968, Miss., 207 So. 2d 104, 107 (at [1]); Craft v. State, 1947, 202 Miss. 43, 30 So.2d 414, 415–416. Cf. Barnett v. United States, 5 Cir. 1967, 384 F.2d 848, 855 (at [4]).[2] The case of Corn v. State, 1964, 250 Miss. 157, 164 So.2d 177, is closely in point. The defendant Corn was arrested by policemen without a warrant because (1) he had sold a $35 record player for $5 and (2) one of the policemen had seen burglary tools in the defendant's car. The Mississippi Supreme Court upheld the arrest on these facts alone.

### (b) Cause for Arrest Without a Warrant in "Silver Platter" Cases

An arrest by state officers with consequent prosecution for a federal offense involves the interaction of two sovereignties. The legal complexities which result from this interaction are illustrated by questions such as the following: Who vests whom with arresting authori-

---

**2.** Some support for Lathers' position might be gleaned from the Mississippi Supreme Court's language in McCollum v. State, 1967, Miss., 197 So.2d 252, 255 (at [2]), but we are reassured in our path by the extensive excerpt in the *McCollum* opinion taken from the Lawyers' Edition annota-
tion to Draper v. United States, 1959, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (found at 3 L.Ed.2d 1736, 1737–39) which holds as sufficient "reasonable caution in the belief that a narcotics offense [referring to Draper] has been or is being committed." 197 So.2d at 255.

ty? What conduct justifies the exercise of that authority? What are the rights, obligations, and duties of arresting officers as to the citizens under their jurisdiction? Lathers asks us to find answers to this concatenation of queries by reference to Mississippi law. His rather unique contention is that Mississippi law invokes the exclusionary rule even if less rigorous federal standards would not. Although we dismiss this contention on the merits, it requires a choice of law decision. We make that choice explicitly in the hope of avoiding misconstruction.

Prior to 1961 evidence obtained through an exclusively state arrest could be admitted into a federal trial regardless of the legality or illegality of the arrest. We quote from Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (in which case the exclusion rule was first established to impede illegal action of federal arresting officers):

> "As to the papers and property seized by the [local] policemen, it does not appear that they acted under any claim of Federal authority such as would make the amendment applicable to such unauthorized seizures. The record shows that what they did by way of arrest and search and seizure was done before the finding of the indictment in the Federal court; under what supposed right or authority does not appear. What remedies the defendant may have against them we need not inquire, as the 4th Amendment is not directed to individual misconduct of such officials. Its limitations reach the Federal government and its agencies. Boyd v. Case, 116 U.S. 616, 29 L.Ed. 746, 6 Sup.Ct.Rep. 524, and see Twining v. New Jersey, 211 U.S. 78, 53 L.Ed. 97, 29 Sup.Ct.Rep. 14." 232 U.S. at 398, 34 S.Ct. at 346.

This immunity from exclusion gained the label "silver platter" doctrine following Justice Frankfurter's opinion in Lustig v. United States, 1949, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819:

> "The crux of that doctrine is that a search is a search by a Federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter." 338 U.S. at 78–79, 69 S.Ct. at 1374.

In Elkins v. United States, 1960, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, the Supreme Court overturned the "silver platter" doctrine and held that evidence obtained as a result of an unconstitutional arrest by state officers must be excluded from federal trials, regardless of whether federal agents participated in the arrest. The Court's extensive and perceptive analysis concluded with the following pronouncement:

> "For these reasons we hold that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from *unreasonable searches and seizures under the Fourth Amendment* is inadmissible over the defendant's timely objection in a federal criminal trial." 364 U.S. at 223–224, 80 S.Ct. at 1447 (Emphasis added.)

The Court continued:

> "In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. *The test is one of federal law*, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." 364 U.S. at 224, 80 S.Ct. at 1447. (Emphasis added.)

Clearly, the Elkins exception to the prior immunity of state arrests was limited to violations of constitutional rights, as opposed to any rights granted in a federal proceeding by judicial supervisory power. Moreover, such constitutional rights were to be defined by federal law. Elucidation on the specifics of the "fed-

eral law" was given in Beck v. State of Ohio, 1964, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142. The Supreme Court in *Beck* denied the admissibility of evidence seized by state officers and used in a state criminal proceeding. The sole issue was the constitutional validity of the arrest, and the Court stated:

"The constitutional validity of the search in this case, then, must depend upon the constitutional validity of the petitioner's arrest. Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense. Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879; Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134." 379 U.S. at 91, 85 S.Ct. at 225.

` * * * * * *`

"When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, [39 A.L.R. 790]." 379 U.S. at 96, 85 S.Ct. at 228.

Under the *Elkins-Beck* amalgam the state standards for arrests without warrants seem irrelevant in "silver platter" cases. And, in fact, such has been the sentiment in several cases with facts comparable to the case at bar. Gullett v. United States, 8 Cir. 1967, 387 F.2d 307, 308 (at fn. 1); United States v. Hopps, 4 Cir. 1964, 331 F.2d 332, 340 (at fn. 8), cert. den., 379 U.S. 820, 85 S.Ct. 39, 13 L.Ed.2d 31; United States v. Callahan, D. Minn.1964, 256 F.Supp. 739, 742 (at [1]). Cf. Paige v. Potts, 5 Cir. 1965,

354 F.2d 212, 214 (at [2]), reviewing a state conviction. Numerous other opinions, *including at least one in our own* circuit, have ignored state law sub silentio. Potter v. United States, 5 Cir. 1966, 362 F.2d 493, 497; United States v. Zimple, 7 Cir. 1963, 318 F.2d 676, 678–79, cert. den., 375 U.S. 868, 84 S.Ct. 128, 11 L.Ed.2d 95; Schook v. United States, 8 Cir. 1964, 337 F.2d 563, 564–66; United States v. Baxter, 6 Cir. 1966, 361 F.2d 116, 119 (at [2]), cert. den., 385 U.S. 834, 87 S.Ct. 79, 17 L.Ed.2d 69; United States v. Ford, 4 Cir. 1966, 363 F.2d 375, 377 (at [6]), United States v. Freeman, 6 Cir. 1967, 382 F.2d 272, 274.

■ The choice-of-law guide, however, which is most often expressed, certainly in this circuit, is that in the absence of a specific federal arresting statute state law determines the legality of state arrests. Collins v. United States, 5 Cir. 1961, 289 F.2d 129, 130–131 (at [3]); Hart v. United States, 5 Cir. 1963, 316 F.2d 916, 919 (at [1–3]); Jackson v. United States, 5 Cir. 1965, 352 F.2d 490, 491 (at [1], cert. den., 1966, 385 U.S. 825, 87 S.Ct. 55, 17 L.Ed.2d 62; Nicholson v. United States, 5 Cir. 1966, 355 F.2d 80, 83 (at [3]), cert. den., 384 U.S. 974, 86 S.Ct. 1866, 16 L.Ed.2d 684; Manuel v. United States, 5 Cir. 1966, 355 F.2d 344, 346–347 (at [5]); Mendoza v. United States, 5 Cir. 1966, 365 F.2d 268, 274 (at [11]); Barnett v. United States, 5 Cir. 1967, 384 F.2d 848, 855 (at [4]); Amador-Gonzalez v. United States, 5 Cir. January 10, 1968, 391 F.2d 308; United States v. Williams, 6 Cir. 1963, 314 F.2d 795, 798 (at [3]); United States v. Gearhart, 4 Cir. 1964, 326 F.2d 412, 414 (at [4], fn. 4); Sabbath v. United States, 9 Cir. 1967, 380 F.2d 108, 110 (at [6, 7], fn. 4), U. S. appeal pending, 389 U.S. 1003, 88 S.Ct. 570, 19 L.Ed.2d 598 (certiorari granted) see 36 L.W. 3290, 36 L.W. 3398; Stone v. United States, 10 Cir. 1967, 385 F.2d 713, 716 (at [5, 6]). See also Johnson v. Middlebrooks, 5 Cir. 1967, 383 F.2d 386, 387 (at [1]), reviewing a state conviction. We hasten to point out that each of the above opinions is distinguishable in that no obliga-

tion existed to decide whether state law was *more* protective than federal law.[3] Thus, in no case was the *Elkins* doctrine extended beyond constitutional proportions.

Moreover, emphasis by federal courts on the state law of arrest is not necessarily inconsistent with *Elkins* and *Beck*. In fact, it is prescribed by an ancillary line of Supreme Court cases. In United States v. Di Re, 1948, 332 U.S. 581, 68 S. Ct. 222, 92 L.Ed. 210, the Supreme Court reviewed an arrest made by a state officer accompanied by an O. P. A. investigator who had no statutory authority to make arrests. The court concluded:

> "No act of Congress lays down a general federal rule for arrest without warrant for federal offenses. None purports to supersede state law. And none applies to this arrest which, while for a federal offense, was made by a state officer accompanied by federal officers who had no power of arrest. Therefore the New York statute provides the standard by which this arrest must stand or fall." 332 U.S. at 589–591, 68 S.Ct. at 227.

Fifteen years later the Supreme Court, reviewing a state conviction through habeas corpus, added a new dimension to the *Di Re* decision:

> "This Court, in cases under the Fourth Amendment, has long recognized that the lawfulness of arrests for federal offenses is to be determined by reference to state law insofar as it is not

violative of the Federal Constitution. Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332, supra; United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); Johnson v. United States, 333 U.S. 10, 15, note 5, 68 S.Ct. 367, 370, 92 L.Ed. 436, 441 (1948). A fortiori, the lawfulness of these arrests by state officers for state offenses is to be determined by California law." Ker v. State of California, 1963, 374 U.S. 23, 37, 83 S.Ct. 1623, 1632, 10 L.Ed.2d 726, 740.

The above pronouncements do not conflict with *Elkins* and *Beck*, if they are considered in context. The *Di Re, Miller,* and *Johnson* decisions (cited in the *Ker* quote *supra*) arose during the "silver platter" era before *Elkins*, and all involved actions by federal as well as local officials. The Court was thus exercising not only constitutional review but also supervisory review of its own representatives common to federal prosecutions.[4] Cf. McNabb v. United States, 1943, 318 U.S. 332, 341, 63 S.Ct. 608, 87 L.Ed. 819, 824, and cases in train thereof. To be sure, the *Ker* opinion followed *Elkins* and spoke in constitutional terms. However, Justice Clark, who authored the *Ker* majority opinion, before stating the above proposition, engaged in analyses both of constitutional "probable cause" for an arrest and of constitutional review versus federal supervisory review (during which he relied on, in fact quoted, the *Elkins* decision). The above reference

---

3. The proposition was suggested by the defendant in Jackson v. United States, 5 Cir. 1965, 352 F.2d 490, 491, but the court found it unnnecessary for the decision. Cf. Ralph v. Pepersack, 4 Cir. 1964, 335 F.2d 128, where the Fourth Circuit reviewed on habeas corpus an arrest by the District of Columbia officers which had led to a conviction in the State of Maryland. The court indicated at one point in its opinion that if the District of Columbia had had an ordinance more restrictive than constitutional standards, such ordinance would have been followed. 335 F.2d at 135 (at [7, 8]). But compare the language in the same case limiting federal review in habeas corpus

to constitutional issues. 335 F.2d at 131–132 (at [1, 2]).

4. Courts are not uniform in interpreting *Di Re* as to whether the review focused on the state officer or the O.P.A. investigator. Compare Alexander v. United States, 5 Cir. 1968, 390 F.2d 101, (and cases cited therein) with Sabbath v. United States, 9 Cir. 1967, 380 F.2d 108, 110–111 (fns. 4 and 5 and accompanying text). At least one commentator has indicated that the *Sabbath* emphasis—on the state officer—is not the normal interpretation. 8 Moore Federal Practice § 4.01 (fn. 18), (compare 1967 edition with 1968 supplement).

to state law, then, focused exclusively on the policeman's method of entering a dwelling when making an arrest, a factor never before examined by the court in constitutional light. In this regard it is important to note that in the *Beck* opinion, which followed *Ker* and which dealt only with "probable cause," no reference was made to the state law of arrest. Nor was any such reference made in McCray v. State of Illinois, 1967, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62, 67, in the section of that opinion which distinguished *Beck* on its facts and thus sustained the validity of a state arrest.

The *Di Re*-to-*Ker* line of opinions (and circuit cases following such opinions)[5] have recognized that where state law provides the only applicable standards and where such law does not violate constitutional safeguards, it will be used even in federal courts. Implicit in the cases are the dual rationales that (1) local legislators and courts are best suited for determining many of the specific details of police procedure and (2) federal and state procedures should be uniform wherever possible. These cases, however, should not be interpreted as calling for the examination of state law in peference to established constitutional guidelines. In some instances *Di Re* and *Ker* may allow federal courts to engage in a sort of "constitutional renvoi," i. e., where arrests by state officers are judged by federal constitutional standards which, because of a void, are determined by the relevant state law. Where the void has been filled, however, the renvoi should not operate.

■ Of course, only state law can determine who are authorized as state "arresting officers" and for what crimes such officers have arresting authority. Thus, even federal courts must look to state law first as to these points. My

ricks v. United States, 5 Cir. 1967, 370 F. 2d 901, cert. dism., 386 U.S. 1015, 87 S.Ct. 1366, 18 L.Ed.2d 474; Swinney v. United States, 5 Cir., March 7, 1968, 391 F.2d 190. But once the authority to arrest has been established, state law need not be consulted as to the arresting *procedure* unless federal law has defaulted. Such is not the case as to the sufficiency of cause required to sustain an arrest without a warrant by a state-authorized arresting officer. See Beck v. State of Ohio, supra, striking an arrest by state officers, and McCray v. State of Illinois, supra. We have no need to impose upon the courts of Mississippi our analysis of their law.

(c) Probable Cause

■ We refer again to Beck v. State of Ohio, 1964, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142:

"The rule of probable cause is a practical, non-technical conception affording the best compromise that has been found for accommodating * * * often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." 379 U.S. at 91, 85 S.Ct. at 226, quoting from Brinegar v. United States, 1944, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, 1891.

Probable cause, then, is a compromise. A hunch is not a probability. See Beck v. State of Ohio, supra; Henry v. United States, 1959, 361 U.S. 98, 101, 80 S.Ct. 168, 4 L.Ed.2d 134. But a probability is not a certainty or a conclusion beyond a reasonable doubt. An officer need not be astronomically precise before making an arrest. See McCray v. State of Illinois, 1967, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62, 67; Draper v. United States, 1959, 358 U.S. 307, 79 S.Ct. 329,

---

5. In Collins v. United States, 5 Cir. 1961, 289 F.2d 129, 130–131, our Circuit's first post-*Elkins* "silver platter" case, the Court cited only *Di Re*, *Johnson* and *Miller* (see the quote from *Ker*, supra). In Hart v. United States, 5 Cir. 1963, 316 F.2d 916, 919, the Court cited only *Di Re*.

All following cases in our Circuit have relied on *Di Re*, *Collins*, and/or *Hart*. (One exception, Johnson v. Middlebrooks, 5 Cir. 1967, 383 F.2d 386, 387, involving a review on habeas corpus, cites only *Ker*.)

**532**

3 L.Ed.2d 327; Brinegar v. United States, 1949, 338 U.S. 160, 69 S.Ct. 1302 93 L.Ed. 1879; Carroll v. United States, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L. Ed. 543; Harris v. United States, 5 Cir. January 11, 1968, 389 F.2d 727; Vaccaro v. United States, 5 Cir. 1961, 296 F. 2d 500, cert. den., 1962, 369 U.S. 890, 82 S.Ct. 1164, 8 L.Ed.2d 289; Flores v. United States, 5 Cir. 1956, 234 F.2d 604.

■ We constellate the facts and situation as viewed by the state police officers immediately before they stopped Lathers on the highway.[6] The officers were informed of a bargain offer to sell an out-of-state car without supporting title. This is not the case of an anonymous informer, and we can take judicial notice that used car salesmen are knowledgeable of the roots of offers to sell quickly and cheaply. Lathers' salesmanship is not compatible with legitimate ownership. We live in a time of bluebook prices for used automobiles, perhaps known to more people than the stock exchange prices. Though not proof of guilt beyond a reasonable doubt, Lathers' free-wheeling mood, combined with his lack of title papers and the out-of-state license, warrant a man of reasonable caution in the belief that Lathers had stolen the car.

Relevant is the case of Gullett v. United States, 8 Cir. 1967, 387 F.2d 307, 310–311:

"We find here that the arresting officers had, at the time of the arrest, the following information: (1) The defendants had purchased a tire or tires, paying at least $7.50 in quarters therefor; (2) the defendants had attempted to sell a quantity of cigarettes, indicating that they had different brands for sale; (3) the driver of the automobile had no driver's license which could be produced; (4) defendant Gullett claimed to be the owner of the automobile; when asked to produce proof

thereof he got from his wallet three different documents indicating ownership of three automobiles other than the Buick they were driving; (5) cartons of cigarettes were observed in the automobile; (6) the officers were aware of recent burglaries in the vicinity where cigarettes and coins were taken.

"We find in these facts and circumstances ample support for the existence of probable cause for a warrantless arrest."

■ Our constitution does not require a trial before an arrest. And while it does not sanction random police custodialism, it permits common sense, honest judgments by police officers in their probable-cause deliberations. We cannot fault that judgment in the case at bar.

### (2) Custodial Interrogation

Following Lathers' arrest he was held in custody for twenty-four hours, during which time he was interrogated four times. Shortly after his arrest Lathers was questioned briefly by state detectives, but he made no inculpatory statements. The detectives told him that they would hold him until they could run a check on the truck. Lathers was not questioned again until nine o'clock the next morning. The state detectives began the interrogation by advising Lathers that they knew the truck was stolen, but again the interview was quite brief and Lathers made no inculpatory statement.

The third interview with Lathers followed the second by about an hour and was conducted by F. B. I. Agent McDaniel. According to McDaniel's trial testimony, he began the conversation in the following manner:

"I identified myself, showed him my credentials card. I told him who I was and told him I wanted to talk to him

---

**6.** We thus avoid the problem of deciding whether Lathers was actually placed under arrest (1) at the moment his car was stopped or (2) after he failed to produce

his papers and was then escorted to the police station. See Henry v. United States, 1959, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134.

concerning the transportation of a truck from Washington, D. C. to Jackson, Mississippi. I told him he did not have to talk to me, but if he did, whatever he said could be used against him in court. I told him he could talk to an attorney, that if he was unable to hire an attorney the Commissioner or the Court would appoint one for him. He said he did not desire an attorney and that he knew his rights."

■ Following the above warning Lathers confessed to his crime.[7] He was then brought down for one more interview with state officers, during which he likewise confessed.

■ Whatever pre-interrogation warnings Lathers may have received from the state officers they were obviously deficient under *Miranda* standards. The extent of the state warnings was explained at trial by one of the interrogators, Detective Sergeant James L. Black of the Jackson Police Department. The following is an excerpt from his direct examination:

"Q. Was he advised of any of his rights before you talked with him?

A. Yes sir, he was. We told him he had every right to remain silent, entitled to counsel, or 'phone call or talk to anyone he wanted before talking to us."

On re-cross examination Detective Black was more specific:

"Q. And throughout the entire time he never had the benefit of any legal advice?

A. He didn't want any.

Q. He didn't want any?

A. Well, I wouldn't say that.

Q. But he didn't have the benefit of right to counsel?

A. Yes, he did.

Q. Who advised him?

A. We advised him that he had a right to an attorney if he wanted one, and I assume it would be his prerogative to call one if he wanted one. We don't furnish attorneys for the people we are talking to. If they want one they have the prerogative to call one."

We need only quote from the *Miranda* opinion in order to show the inadequacy of the state interrogation procedure:

"To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be

---

7. At trial Lathers denied both the warning and the confession, but our appellate review, as it relates to factual disputes, must take "the view most favorable to the Government." Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704. The unfortunate plight of a lonely defendant contesting the fact of his warning and confession was recognized in *Miranda*, and some commentators have interpreted that case as creating a "presumption of perjury" on police testimony which is uncorroborated by objective means (tape recording, signed waiver, or even perhaps the presence of a lawyer). See George, Constitutional Limitations on Evidence in Criminal Cases 120 (1960), quoted favorably at Comment, "Custodial Interrogation as a Tool of Law Enforcement: Miranda v. Arizona and the Texas Code of Criminal Procedure," 21 Southwestern Law Journal 253, 262 (1967). As yet, however, whatever presumption against uncorroborated testimony which may have been created by the *Miranda* decision has not attained the status of a per se conclusion. And see 8 Moore, Federal Practice § 44.03 (1968 Supp. page 81), which concludes:

"Note that Miranda v. Arizona, supra, [384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694], makes no provision for recording the interrogation. While the burden of proving waiver and voluntariness is on the prosecution, it nevertheless appears that the courts are going to be faced with a plethora of 'swearing contests.'"

scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent,. that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." 384 U.S. at 478–479, 86 S.Ct. at 1630.

On the specific point of "furnishing lawyers for the people we are talking to," we quote the following:

"In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowl-

edge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it." 384 U.S. at 473, 86 S.Ct. at 1627.

One final section will suffice:

"Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right." 384 U.S. at 471–472, 86 S.Ct. at 1626.

 The government relies on F. B. I. Agent McDaniel's warning to Lathers quoted supra, to clothe the confessions with evidentiary sanctity. As will be demonstrated infra, we must strike McDaniel's warning as being itself insufficient; therefore, we will not consider whether, if it had been sufficient, such warnings was given early enough in the interrogation process to preserve Lathers' rights. Westover v. United States, 1966, 384 U.S. 436, 494–497, 86 S.Ct. 1602, 16 L.Ed.2d 694, 735–736 (included in the *Miranda* opinion).[8]

---

8. In the *Miranda* opinion the Supreme Court reversed the federal conviction of Carl Calvin Westover, stating in part:
"We reverse. On the facts of this case we cannot find that Westover knowingly and intelligently waived his right to remain silent and his right to consult with counsel prior to the time he made the statement. At the time the FBI agents began questioning West-

over, he had been in custody for over 14 hours and had been interrogated at length during that period. The FBI interrogation began immediately upon the conclusion of the interrogation by Kansas City police and was conducted in local police headquarters. Although the two law enforcement authorities are legally distinct and the crimes for which they interrogated Westover were differ-

Because the *Miranda* guidelines apply only to criminal trials commencing after June 13, 1966,[9] appellant reaction to those guidelines has been slow in coming. Nevertheless, the recent cases in our circuit have uniformly held that *Miranda* requires the pre-confession warning to specify that a defendant is entitled "to the *presence* of an attorney, retained or appointed during the interrogation." Windsor v. United States, 5 Cir. 1968, 389 F.2d 530, 533, quoted in Chambers v. United States, 5 Cir. March 20, 1968, 391 F.2d 455, 456. In *Windsor* the indigent defendant was advised that he could retain an attorney immediately and that an attorney would be appointed by the court *in the event he was arrested*. The confession which followed that warning was excluded by this court. Similarly, in Fendley v. United States, 5 Cir. 1967, 384 F.2d 923, a confession was excluded where the defendant was warned that "he had the right to consult an attorney or anyone else before making a statement," and that "if he did not have any money to obtain an attorney that the Judge, the Court, would appoint one for him *when he went to court.*" (Emphasis added.)

McDaniel's warning to Lathers provided that "if he was unable to hire an attorney the Commissioner or the Court would appoint one for him." To be sure, such a warning does not have the flagrant deficiencies of the warnings in either *Windsor* or *Fendley*. But neither does the warning lay out in clear terms the

extent of Lathers' rights. Lathers was not advised that he could have an attorney appointed and present with him before he uttered a syllable. The message to him indicated only that a judge or commissioner somewhere down the line would appoint a lawyer for him if he so requested.

The *Miranda* warning must effectively convey to the accused that he is entitled to a government-furnished counsel here and now. If the words are subject to the construction that such counsel will be available only in the future, *Miranda* has not been obeyed. Although there is no talismanic or heraldic abracadabra which must be fulfilled, the offer of counsel must be clarion and firm, not one of mere impressionism. The words must asseverate with conviction that any accused can have a lawyer before speaking.[10] Otherwise, the warning is delusory and the *Miranda* safeguards are illusory.

In our constitutional supervision of the interrogation process we should not be obsessed by petty irregularities in sentence syntax. We must, however, be keenly aware of both semantics and the law of probabilities. Moreover, when the prerogative of obscurantism rests with the government, the burden falls squarely on the government's shoulders to prove an offer without equivocation or ambivalence. In the case at bar, the proof did not even come close. The offering words must be so clear that they distill all doubt. One custodially detained must know that as a prelude to

ent, the impact on him was that of a continuous period of questioning. There is no evidence of any warning given prior to the FBI interrogation nor is there any evidence of an articulated waiver of rights after the FBI commenced its interrogation. The record simply shows that the defendant did in fact confess a short time after being turned over to the FBI following interrogation by local police. Despite the fact that the FBI agents gave warnings at the outset of their interview, from Westover's point of view the warnings came at the end of the interrogation process. In these circumstances an intelligent waiver of constitutional rights

cannot be assumed." 384 U.S. at 495–496, 86 S.Ct. at 1639.

We note, without intending it as a comment on the case at bar, that *Westover* has been distinguished recently by our circuit in cases in which convictions have been affirmed: Nobles v. United States, 5 Cir. March 20, 1968, 391 F.2d 602; Jennings v. United States, 5 Cir. March 8, 1968, 391 F.2d 512.

9. Johnson v. State of New Jersey, 384 U.S. 719, 733, 86 S.Ct. 1772, 16 L.Ed.2d 882, 892.

10. For a sample of an effective *Miranda* warning, see Hodge v. United States, 5 Cir. March 27, 1968, 392 F.2d 552.

interrogation he can have a government furnished attorney if he is unable to engage one.

The edicts of *Miranda* have been violated.

Reversed and remanded.

RIVES, Circuit Judge (concurring in part and dissenting part).

I heartily concur in that part of the majority opinion and decision which holds that the repeated interrogations of Lathers were violative of his constitutional rights as announced in *Miranda,* and hence that the judgment of conviction must be reversed and the case remanded. Reluctantly, however, I must dissent from that part of the opinion and decision which holds that Lathers' arrest was legal. In my opinion Lathers' arrest without a warrant and particularly his confinement and the search of the truck constituted an unreasonable seizure and search in violation of the Fourth Amendment under *Elkins* v. United States, 1960, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, and Beck v. State of Ohio, 1964, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142.

All three Judges agree that the judgment must be reversed and the case remanded on the ground that the *Miranda* precepts were not followed. That holding, however, does not relieve us of the duty to rule upon the constitutionality of Lathers' arrest and confinement and the search of the truck, for, upon Lathers' re-trial, in addition to the results of his interrogation, including the claimed oral confession inadmissible under *Miranda,* more potent and crucial evidence will become inadmissible if we hold the arrest, confinement and search illegal. All of the evidence flowing from the illegal arrest, confinement and search would then be inadmissible. Such evidence includes the secret number on the frame of the truck. It was that number which established the identity of the truck with the stolen vehicle.[1] It follows that whether Lathers is retried, or if retried whether he is acquitted or convicted, may well depend upon the legality of his arrest and confinement and the search of the truck. Hence, that issue requires our most careful consideration.

Under the Supreme Court's ruling in *Beck*, the constitutional validity of Lathers' arrest and the ensuing search depend upon "whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." 379 U.S. at 91, 85 S.Ct. at 225.

The burden of proof has been well stated as follows:

"It is clear that in every case the government has the burden of establishing that the probable cause requirement has been met, Wong Sun v. United States, 371 U.S. 471, 479–480, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Carroll v. United States, supra [267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543]; United States v. Rivera, 321 F.2d 704, 708, 2 Cir. 1963; United States v. Dornblut, 261 F.2d 949, 2 Cir. 1958. The government, however, may not validate an initially invalid arrest by the fruits of the incidental search. The litmus paper of reasonableness must be applied when the arrest is made, and, unless it proves positive, the arrest will be illegal and its proceeds inadmissible. United States v. DiRe, 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948)."

---

1. As Detective Sergeant J. L. Black testified:

"A. Along with Special Agent Roy McDaniels and my partner, J. D. Moore, we checked the serial plate on the door and found it had been removed. We found the secret number on the frame of the truck, which was C1545B114860.

"Q. I will hand you Government's Exhibit No. 1 and ask you to compare the number you found with this title certificate number and see if they are the same.

"A. Yes, that is the same one."

United States v. Campos, S.D.N.Y.1966, 255 F.Supp. 853, 857, aff'd, 2 Cir., 362 F.2d 1011.

Lathers was arrested by two Jackson, Mississippi, policeman, J. B. Hall and R. L. Chapman. According to their testimony, the only information that either had was the bulletin issued by the Jackson Police Department. The evidence does not disclose the bulletin itself or its exact contents. As shown in footnote 1 to the majority opinion, the officers' testimony differed as to the meaning of the bulletin. Neither officer's recollection amounted to more than bare suspicion. One thought the bulletin described the truck as "being stolen or suspected stolen"; the other thought that someone "had tried to sell the truck at too low a price." Footnote 6 to the majority opinion assumes that Lathers also "failed to produce his papers" after the police officers stopped his truck, but neither officer testified that there was any request for or discussion of the title papers. Lathers, testifying in his own behalf, did not refer to any request by the officers or conversation with them about title papers but only that:

"They pulled up behind me and motioned me over and I pulled over. It was a kind of warehouse district and he said, 'Let me see your drivers license.' And I said, 'Did I make some violation?' I thought it was an illegal turn or something like that. He said, 'No, I just want to see your drivers license.' He looked at the drivers license and I can't remember whether he handed it back to me or kept it. I asked him again why I was being stopped. He said, 'We want to take you down and question you.' I said, 'What about?' He says, 'To do with the theft of a motor vehicle.'—suspicion or cause or something of the theft of a motor vehicle. That is what the arrest amounted to."

Like Lathers, the officers themselves testified in effect that the arrest was made on bare suspicion or for investigation. Officer Hall testified: "I informed him that information had been put out that the truck was under suspect of being stolen and I told him I would have to carry him by the office for investigation in this matter." Officer Chapman gave Lathers no further information or cause for his arrest. Neither officer swore out a warrant or booked Lathers with any charge.

Indeed, to my way of thinking, a most important factor, which the majority has overlooked, is that no warrant was issued and no formal charge placed against Lathers until many hours after his arrest, at which time he was turned over to FBI Agent Roy McDaniel. Mr. McDaniel testified:

"Q. But he had been initially arrested and held in a state of arrest by the Jackson police officers for about twenty-four hours before you saw him?

"A. Well, I don't know about the arrest. I know he was in custody or at the Jackson Police Department from about noon on Monday, July 25th, until I talked to him at 9:04 on the morning of July 26th."

Up until that time the lack of any warrant or formal charge is clearly shown by the testimony of Detective Sergeant Black:

"Q. And you told him, did you not, that you all were holding him on suspicion?

"A. Investigation of auto theft.

"Q. And that was all?

"A. That is all.

"Q. And how many days did you hold him that way?

"A. We placed him in jail about noon of the 25th. The teletype came back in that night from the FBI office, the FBI confirming the truck being stolen. And then that is when the charge was placed against him of auto theft.

"Q. When did you actually place the charges against him?

"A. We didn't place the charges against him for auto theft. We placed

charges against him to hold him for the Federal Bureau of Investigation.

"Q. So the Jackson Police Department placed no charge against him other than to hold him for the FBI?

"A. No sir, none other than to hold him for the FBI.

"Q. You just held him without any charge against him?

"A. We held him until the confirmation came back, and—.

"Q. And all that—.

\* \* \* \* \* \*

"A. We held him on the charge of investigating for auto theft until the confirmation came back. Roy McDaniels and the FBI was going to take the case as an auto theft case, therefore we held him until the Marshals came to the Jackson Police Department and removed him to a Federal jail.

"Q. But all these conversations that you and other members of the Jackson Police Department had with him, no charge had been preferred against the man at that time, had there?

"A. Other than investigation of auto theft charge.

"Q. You were just holding him on suspicion, without any charge being made?

"A. Yes sir, on investigation charge.

"Q. You hadn't carried him before any Magistrate of anything?

"A. No sir.

"Q. You just held him?

"A. Yes sir.

"Q. How long did you hold him?

"A. I don't know when the Marshals came and got him. I know we had him about noon the day of arrest until at least the next day after we had talked to him and he told us he had stolen the truck.

"Q. You were just holding him there without any charge up until that time?

"A. That is right."

None of the witnesses dispute that testimony. I submit that it brings the case squarely within the Fifth Circuit cases of Collins v. United States, 1961, 289 F.2d 129, and Staples v. United States, 1963, 320 F.2d 817, 820. See also, Barnett v. United States, 1967, 384 F.2d 848, 855, 856.

Indeed, the factual situation in this case is more extreme than that in any of those three cases. For here literally *no* charge, except "investigation of auto theft," was placed against Lathers. It is virtually admitted that he could not properly be charged with a crime until the investigation had proceeded to the point of discovery that a crime had been committed—that the truck had been stolen. The moment of arrest is the critical time at which probable cause must exist. The fact that the truck was a stolen vehicle was discovered hours after the arrest. So long as Lathers was held without charge, he was held without the right to bail. That this Court would sanction such a practice seems inconceivable. It means that a motorist who travels beyond the borders of his state, and who is met with an emergency requiring the sale of his car, must, at the peril of being jailed without bond, have had the foresight to bring with him the title papers to his car and must not place any trust in a used car dealer. That may be the part of wisdom, but there is no law which imposes such a drastic penalty for failing to act so wisely.

The majority treats the case as if the arrest were for violation of the Dyer Act, which I respectfully submit is contrary to the facts. On the assumption, however, of a Dyer Act arrest, it nonetheless seems clear that there was no probable cause.

To state the case as strongly as possible for the Government, let us go a step further and assume also that the arresting officers had all of the information which the Jackson Police Department possessed. See Williams v. United States, 1962, 113 U.S.App.D.C. 371, 308

F.2d 326; Smith v. United States, 1966, 123 U.S.App.D.C. 202, 358 F.2d 833.

We must remember that the burden rested on the Government to justify this arrest without a warrant. Used car salesman Daughtery is recognized as the source of all of the information possessed by the FBI and then second hand by the Jackson Police Department. Mr. Daughtery never claimed that his information was sufficient to do more than arouse suspicion:

"A. Oftentimes in the car business you establish a price that the seller and the buyer can agree upon, you will bid low and see just exactly what he will take. Our discussion was that I asked him what he wanted for the truck and he said he didn't know because he didn't know the market. I said, 'Surely you know somewhere around what you would take.' And, I said, 'Would you take $500.00?' He said yes, that he would take $500.00.

"Q. When he said that is when you became suspicious?

"A. Yes sir."

Lathers' conversation with Mr. Daughtery was barely sufficient to arouse even a suspicion of theft:

"Q. And you asked him what he would take for it?

"A. Yes sir.

"Q. And he said he didn't know the value of the truck?

"A. Yes sir.

"Q. And he left it up to you to determine the value?

"A. Yes sir.

"Q. And you fixed the value at $500.00?

"A. Yes sir, I just made him an offer.

"Q. You knew he was trusting you to tell him what the real value of it was and he told you he didn't know what the value was, didn't he?

"A. That is correct.

"Q. And he left it up to you to determine?

"A. Yes sir.

"Q. And you did determine it at $500.00.

"A. Yes sir."

As I understand the majority's holding, it is that Mr. Daughtery passed on to the FBI and thence to the Jackson Police Department the three elements of (1) out-of-state license, (2) lack of title papers and (3) offer to sell cheaply, and that such information coming from a used car salesman with his assumed expertise in car sales is enough to constitute probable cause. There are many things wrong with this synthesis, of which I will mention only a few. First, according to his testimony, as has been seen, Daughtery was merely suspicious, nothing more. Second, Daughtery did not testify to any request for or conversation about title papers. The first witness to so testify was Mel Heard, the manager of the other used car lot. So far as the testimony shows, however, Heard did not communicate with either the FBI or the Jackson Police Department. So the Jackson Police Department had no information of a lack of title papers. Third, Daughtery did not (and, I submit, could not) testify that the out-of-state license aroused his suspicion. That was merely descriptive of the truck. Thus the sole basis for Daughtery's suspicion was Lathers' acceptance of his cheap offer made under circumstances when, according to Daughtery himself, Lathers said he didn't know the market and was trusting Daughtery to tell him the value of the truck. Fourth, to meet its burden, the Government introduced no evidence of what Daughtery reported to the FBI nor of what the FBI relayed to the Jackson Police Department. Daughtery testified to no more than: "A. I called the FBI. Q. What did you call them for? A. To report it." We are left to surmise the terms of his report as best we can. Mr. McDaniel, the FBI Agent, gave no testimony of what Daughterty told the FBI nor of what the FBI passed on to the Jackson Police Department. The only sources from which we can draw any inferences

are the testimony as to what Daughtery himself knew and the contradictory testimony about the bulletin given by the two arresting officers and quoted in footnote 1 to the majority opinion.

When the Jackson Police Department never sought a warrant on the basis of their information, it seems clear that they knew that no probable cause existed for the issuance of a warrant. Further, the conduct of the Jackson Police Department and of the arresting officers in holding Lathers simply on suspicion or for investigation shows that they recognized that there was no probable cause for a warrant or charge of theft or violation of the Dyer Act. With deference, I submit that it is difficult to conceive of a clearer case of lack of probable cause. And even if that hurdle were overcome, the arrest would be illegal because the charge was not a criminal offense but merely for investigation. I, therefore, respectfully concur in part and dissent in part.