William E. YOUNG

v.

WARDEN, MARYLAND PENI-
TENTIARY.

Civ. A. No. 72-690-W.

United States District Court,
D. Maryland.

Sept. 16, 1974.

Barrett W. Freedlander, Baltimore, Md., for petitioner.

Francis B. Burch, Atty. Gen., John P. Stafford, Jr., Asst. Atty. Gen., and Emory A. Plitt, Jr., Asst. Atty. Gen., Baltimore, Md., for respondent.

WATKINS, Senior District Judge.

On May 9, 1967, Petitioner William E. Young was found guilty of murder in the first degree and assault with intent to commit rape by Judge John N. Maguire sitting without a jury in the Circuit Court for Baltimore County[1], Maryland. Young, who is presently serving concurrent sentences of life imprisonment and twenty years imprisonment in the Maryland Penitentiary, seeks in this Court the issuance of a federal writ of habeas corpus.

Following the appointment of counsel to represent him in these proceedings, Petitioner filed in this Court a petition for writ of habeas corpus and memorandum in support thereof, alleging that:

His conviction was in violation of the Fourteenth Amendment of the United States Constitution because:

a. There was insufficient evidence to convict.

b. His confession was inadmissible because it was the fruit of an illegal arrest.

---

1. The case had been removed from the Criminal Court of Baltimore City to Baltimore County upon Petitioner's motion.

c. His confession was inadmissible because it was induced by the line-up which in turn was a fruit of the illegal arrest.

d. The warnings prescribed by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 17 L.Ed.2d 694 (1966) were not given to Petitioner.

e. The totality of the circumstances surrounding the interrogation, in this case, were so overbearing as to render the confession involuntary.

f. The State failed to rebut Petitioner's assertion that the confession was induced by a promise that he could go home afterwards.

Thereafter, Petitioner filed a supplementary petition and memorandum alleging as an additional ground for relief that:

g. He was denied effective assistance of counsel.

On February 23, 1973, this Court conducted an evidentiary hearing at which evidence was presented as to the legality of the arrest (contentions b and c) and competency of counsel (contention g), and argument was heard as to the remaining contentions. After full consideration of these proceedings, the briefs, and the record of Petitioner's trial, this Court concludes that the petition is without merit and therefore will be dismissed.

## FACTS

Sometime on the night of October 14, 1966, Mrs. Elizabeth Roddy, age seventy-two, was sexually assaulted and killed in her apartment at 877 Park Avenue. The Medical Examiner fixed the time of death at 8:00 P.M., give or take several hours.

Apparently through their investigation of the homicide the police learned that on that evening a man had visited a number of apartments on Park Avenue, within the immediate vicinity of the deceased's residence, searching for a person named Frank.

On the afternoon of October 20, 1966, police responded to a call from a woman who lived at 869 Park Avenue. They were met by the complainant's niece, Mrs. Pauline Prendergast, who lived next door to her aunt at 867 Park Avenue. At trial Mrs. Prendergast testified that following the murder she had told her aunt that if anything unusual happened she (the aunt) should rap on the wall separating their apartments. Mrs. Prendergast further testified that on October 20, 1966, she had heard a hard rapping on her wall, and going to her door saw Petitioner come into her building and try her door. When Mrs. Prendergast left her apartment, Petitioner was no longer there; during this time her aunt had called the police. Mrs. Prendergast had not been home on the night of the murder and this was the first time she had seen Petitioner.

Detective Sergeant John Lewandowski, one of the officers who responded to the call, testified at the evidentiary hearing that upon arriving at 869 Park Avenue, he talked with a woman identified as Mrs. Prendergast, who directed his attention to a man standing on a street corner less than a block away. Lewandowski and another officer approached the man, who turned out to be Petitioner, identified themselves, and asked him his name and what he was doing. When Petitioner responded that he was looking for Frank, the officers placed Petitioner in their car and drove him to the Central District Police Station.

After being booked, Petitioner was taken to an interrogation room where he was questioned by Captain (then Lieutenant) James Cadden from approximately 4:45 P.M. until 6:00 P.M. With the exception of admitting that he had been on Park Avenue looking for Frank on the night of the murder, Petitioner made no statements at this time and denied having any connection with the homicide. At the conclusion of this interrogation Petitioner was fed, photographed, and then placed in a cell.

About two hours later, approximately 8:00 P.M., Petitioner took part in a line-up where he was identified by four

Park Avenue residents as being the man who had visited their apartments on the night of the murder looking for Frank. Apparently, as a result of these identifications, Petitioner began to cry while still in the line-up and, as he was taken from the line-up room, still crying, he suddenly stated, "I didn't mean to kill her." At this point Petitioner was returned to the interrogation room where he repeated his statement to Captain Cadden several times. Thereafter Petitioner made a detailed statement which was reduced to writing. According to this statement, Petitioner had gone to Park Avenue around 11:00 P.M. on the night of the homicide to look for Frank, a man he had met several weeks earlier and who lived somewhere on Park Avenue. When he was unable to locate Frank's house, Petitioner went to several apartments and asked for Frank, without success. Petitioner was finally admitted to one apartment building by a woman, who after talking briefly with him, told him to leave. Petitioner pretended to leave the building, but instead entered a first floor apartment. There he encountered a woman whom he described as having gray hair and being in her late fifties, who yelled at Petitioner to get out. As he started towards the door the woman, following close behind him, continued to yell at him. Petitioner became angered and slammed the door at her; the door struck her and the woman fell down in the hall. According to Petitioner, he looked around the apartment for Frank, got a drink of water and left. Petitioner concluded this narration by saying that he didn't molest the woman and that he didn't mean to hurt her.

After making this statement, Petitioner refused to sign it. The volunteered statement and this confession plus the identifications of Petitioner as the man who was looking for Frank and the post mortem report, essentially constitute all the evidence against Petitioner.

### EXHAUSTION OF STATE REMEDIES

28 U.S.C. § 2254 requires that a habeas petitioner, before presenting his claims to a federal district court, first exhaust any state remedies available to him at the time he files his petition. While Petitioner has satisfied this requirement with respect to contentions a, b, d and e, it does not appear that he has exhausted his state remedies with respect to contentions c, f and g.

The Maryland Uniform Post Conviction Act, §§ 645A–645J, Art. 27, Ann.Code of Md. (1971 Repl.Vol., 1973 Supp.)—permits the institution of proceedings to set aside a criminal sentence so long as the error alleged therein has not been waived or finally litigated. For purposes of the Act an allegation of error is finally litigated when the Maryland Court of Appeals or the Court of Special Appeals has rendered a decision on the merits thereof, either upon direct appeal or upon consideration of an application for leave to appeal filed pursuant to the Act; an allegation of error is deemed to be waived if it could have been raised before or at trial, on direct appeal (whether or not an appeal was taken), in a habeas corpus or coram nobis proceeding actually instituted by the petitioner, or in a prior proceeding under the Act, unless the failure to so raise the error is excused by special circumstances.

Although Petitioner did take a direct appeal of his conviction and thereafter instituted proceedings under the Post Conviction Procedure Act, he has not "finally litigated" those claims raised here as contentions c, f and g. In his initial post conviction proceedings Petitioner did not specifically raise the contention that his confession was inadmissible because it was induced by the line-up which in turn was the fruit of an illegal arrest (contention c); he did raise the alternative claim, also raised here, that his confession should have been excluded as the fruit of an illegal arrest. However, inasmuch as the Post Conviction Court disposed of this claim without considering the legality of the arrest, its resolution of the latter contention would not be determinative of the former. Similarly, Petitioner has not previously raised his contention that the

State failed to introduce evidence to rebut his in-court assertion that the confession was induced by certain promises. While the Court of Special Appeals concluded in direct appeal that Petitioner's confession was voluntary, and the Post Conviction Court found that the issue of voluntariness had been "finally litigated," it is clear that Petitioner is not here challenging the voluntary character of his confession; rather, he simply contends that as a matter of state law the State had to introduce rebuttal evidence before his confession could be found to be voluntary. Finally, although Petitioner did raise the issue of competency of counsel in his post conviction proceeding, the specific instances of incompetency alleged there differ from those raised here. It is therefore questionable that Petitioner has properly presented those allegations for consideration in the state forum.

■ Since neither the Court of Appeals nor the Court of Special Appeals has directly passed upon these three contentions, they have not been "finally litigated." It therefore appears that Petitioner, at least upon a showing of special circumstances, could raise these claims in another post conviction petition. Under these circumstances, he cannot be said to have exhausted his available state remedies.

Petitioner's apparent failure to exhaust his state remedies provides a sufficient ground for dismissing with respect to these three contentions. However, in view of this Court's conclusion that they are dismissable upon the merits, thereby alleviating any possible federal-state comity problems, they will be treated as if they had been exhausted.

## SUFFICIENCY OF THE EVIDENCE

Initially Petitioner attacks the sufficiency of the evidence to support his conviction.

■ It is well settled that where the sufficiency of the evidence supporting a state conviction is challenged by way of federal habeas corpus, the sole inquiry for the habeas court is simply whether the conviction rests upon any evidence at all; the probative strength of the evidence is never in issue. Williams v. Peyton, 414 F.2d 776 (4 Cir. 1969); Young v. Boles, 343 F.2d 136 (4 Cir. 1965).

■ Here the corpus delicti of both crimes is evidenced by the medical examiner's testimony and report. Furthermore, although Petitioner's statements do not specifically identify Mrs. Roddy as the woman involved in the door slamming incident or identify the apartment in which the incident occurred as being Mrs. Roddy's, this Court believes that they constitute some evidence to support the conviction. Petitioner's written statement does contain a general description of the woman he claims to have struck with the door, which fits Mrs. Roddy, and describes the apartment in which the incident occurred as situated on the first floor of a Park Avenue apartment building. Finally, the testimony of four witnesses placed Petitioner within the immediate vicinity of Mrs. Roddy's apartment at the approximate time of the homicide. Therefore, since Petitioner's conviction is supported by some evidence, his first contention must fail.

## LEGALITY OF THE ARREST

Petitioner's second and third contentions (b and c) go to the legality of his arrest. Petitioner asserts that the police lacked probable cause to arrest and that therefore his confession should have been excluded from evidence either because it was the fruit of an illegal arrest, or because it was induced by the line-up which in turn was the fruit of an illegal arrest.

Petitioner was arrested on October 20, 1966, six days after the homicide, while standing on a street corner less than a block from the deceased's apartment. The arrest followed a complaint to the police from an unnamed woman who lived within a few doors of Mrs. Roddy, about a suspicious person who was ring-

ing doorbells in the 800 block of Park Avenue. Detective Sergeants John Lewandowski and Elbert Shirey, who were operating a plain clothes unit in the vicinity, overheard a police dispatcher direct a patrol car to investigate the complaint and decided to respond since they were closer to the location. Upon their arrival they were met by a Mrs. Pauline Prendergast, the complainant's niece, who lived next door to her aunt. Mrs. Prendergast directed the officers attention to a man who was standing on the street corner, less than a block away. The two officers approached the man, who turned out to be Petitioner, identified themselves, and asked him who he was and what he was doing. In response, Petitioner stated that he was looking for Frank. At this point he was taken into custody.

At the time they responded to the complaint both Lewandowski and Shirey knew that a homicide had been committed in the 800 block of Park Avenue. Moreover, both officers had read the police report respecting the homicide which contained a description of the man sought in connection with the crime and the further information that the suspect had been in the neighborhood on the night of the homicide ostensibly looking for someone named Frank. Sergeant Lewandowski also testified that as he approached Petitioner he noted that Petitioner matched the description of the suspect given in the police report.

Petitioner contends that the information provided by Mrs. Prendergast was insufficient to establish the probable cause necessary to sustain the arrest. Petitioner further asserts that Mrs. Prendergast was not a reliable informant in that she had not been at home on the night of the homicide, had never seen Petitioner until the day of the arrest, and because her knowledge of Petitioner was derived solely from conversations

with her aunt and a rapping on her wall.[2]

It is clear, however, that Petitioner's arrest was not premised upon information obtained from Mrs. Prendergast; rather the officers acted on knowledge that they possessed independent of Mrs. Prendergast; e. g., the description contained in the police report and the fact that both Petitioner and the individual described in the report had both been in the 800 block of Park Avenue for the singular purpose of locating someone named Frank.

In the face of what appears to be a strong case of probable cause, Petitioner contends that he was arrested when the officers initially approached him and told him to "stand fast," thereby excluding from consideration as a basis for probable cause any statements he then made, including the response that he was looking for Frank.

It is impossible of course for this Court to enter Petitioner's mind at a point some seven years distant to determine whether he reasonably believed himself to be under arrest at that moment. However, regardless of the relative merit of Petitioner's claim, this Court need not reach the issue of the legality of the arrest to resolve his central contentions.

■ Petitioner urges upon this Court a *per se* rule which would automatically exclude from evidence any statements obtained from an accused while detained under an illegal arrest. Regardless of the practice or rule in other circuits, the Fourth Circuit follows no such *per se* rule.

In United States v. Close, 349 F.2d 841 (4 Cir. 1965), cert. denied, 382 U.S. 992, 86 S.Ct. 573, 15 L.Ed.2d 479 (1966), the Court of Appeals for the Fourth Circuit plainly stated that an illegal arrest, without more, would not

2. It will be remembered that Mrs. Prendergast testified at trial, over defense counsel's objection, that following the homicide she had told her aunt to rap on the wall separating their apartments if anything unusual occurred. She further testified that on the day of the arrest she had heard a rapping on her wall and that upon going to her door she saw Petitioner.

render an accused's statement inadmissible. There the appellant, while under arrest for vagrancy, made several incriminatory statements respecting a bank robbery for which he was subsequently prosecuted and convicted. On appeal, the appellant argued that his arrest for vagrancy was without probable cause, and therefore his inculpatory statements should have been excluded from evidence. Although the court found that the vagrancy arrest was supported by probable cause, it went on to say:

> It is true, as appellant contends, that the Supreme Court held in Wong Sun v. United States, 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963), that oral statements of an accused may be so inextricably and intimately bound up with the conditions and circumstances of an *illegal* arrest as to become tainted and inadmissible under the exclusionary rule of Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, supplemented by Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319. [Court's emphasis].
>
> . . . . . .
>
> Assuming, arguendo, that the initial arrest by the Roanoke police was illegal, we construe Wong Sun as holding, in effect, *that not all oral statements are the fruit of the "poisonous tree" simply because they would not have been made but for the illegal actions of the police.* We think the Court in Wong Sun, clearly indicates the view that a statement which is shown to have been freely and voluntarily made without coercion, either physical or psychological, may be thereby purged of any stigma of illegality and the statement is admissible. . . .
> [349 F.2d at 851, emphasis added].

More recently, in McCloud v. Bounds, 474 F.2d 968 (4 Cir. 1973), the court held that a confession obtained following an illegal search, seizure, and arrest was inadmissible. There, however, the court found a "manifest causal relationship" between the police illegality and the confession which it viewed as distinguishing that case from those holding that a mere detention following an illegal arrest did not necessarily operate to exclude a voluntary confession made during the detention.

And, in Wickline v. Slayton, 356 F. Supp. 140 (E.D.Va.1973), the court held that merely finding that a search and seizure was illegal did not resolve the issue of whether the habeas petitioner's confession was a fruit of the illegality:

> We agree with the petitioner that the search warrant in question was invalid under Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). This, however, does not answer the question of whether his confession was the fruit of the unlawful search and seizure.
>
> . . . . . .
>
> We think these cases stand for the rule that there must be a strong nexus or interrelationship between the initial illegality and any subsequent confession. This nexus can be shown only where the decision to speak is significantly affected by the prior constitutional error. Where the statement is given voluntarily, without unlawful coercion, either physical or psychological, the nexus is so attenuated as to dissipate the taint. *Wong Sun* dealt with an illegal arrest rather than a confrontation with inadmissible evidence, but we think the legal standard for voluntariness in both cases would be the same. The only difference would be factual, in that such a confrontation potentially might have a more coercive effect than the mere fact of an unlawful arrest. The *Miranda* warnings apprise one of his part, remove the coercion to speak after an illegal arrest. They would not do so when the defendant is confronted with illegally obtained evidence. *Miranda* warnings would, in large right to remain silent, but they fail to inform him that the evidence may never be used against him. Where the unlawfully obtained evidence exerts a substantial influence on a person's de-

cision to speak, then this evidence is tainted with the initial constitutional error. [356 F.Supp. at 142–143].

The court there concluded that the petitioner had failed to show that the search and seizure had "substantially influenced" his decision to speak and that his confession was therefore admissible.

The above cases clearly demonstrate that the mere fact that a confession was obtained from an accused while detained under an illegal arrest does not vitiate, without more, the confession; rather some causal relationship, some nexus, must be shown to exist between the alleged illegality and the confession.

■ Significantly, and as pointed out above, Petitioner urges this Court to adopt a *per se* approach; there is no allegation of any causal relationship between the arrest and the confession, and there is nothing in the record which indicates that Petitioner's decision to confess was "substantially influenced" or "significantly affected," Wickline v. Slayton, *supra* at 143, by the arrest. Indeed, the fact that Petitioner made no statement during the initial interrogation immediately following the arrest, clearly demonstrates that the arrest had a minimal influence upon him. Moreover, as will be discussed below, Petitioner was properly advised of his *Miranda* rights and his confession was freely and voluntarily given. Under these circumstances, even assuming the arrest to have been without probable cause, that fact would not warrant the exclusion of Petitioner's statement from evidence.

■ Nor is this Court persuaded by Petitioner's alternative contention that his confession should have been excluded because it was induced by the line-up, which in turn was the fruit of an illegal arrest. Certainly, if the police had not arrested Petitioner they would not have been able to place him in the line-up, but as pointed out above this but-for relationship, by itself, is not enough to re-

quire the exclusion of Petitioner's confession. At the time of the line-up Petitioner had been in custody for approximately four hours, had been advised of his rights, and had withstood one session of questioning, again indicating that the "illegal" arrest had a de minimis effect upon him. Furthermore, there is no allegation that there was anything improper about the manner in which the line-up was conducted, or that it was directed toward or utilized for the obtaining of a statement from Petitioner. Under these circumstances this Court believes that any connection between the illegality, assuming the arrest to have been illegal, and the confession, would be sufficiently attenuated to permit the introduction of the confession into evidence.

## ADEQUACY OF MIRANDA WARNINGS

Petitioner contends that his unsigned confession should have been excluded from evidence because he was not properly advised of his *Miranda* rights. Specifically, he alleges that he was not informed of his right to have counsel present *during interrogation.*[3]

At trial Petitioner's unsigned statement was admitted into evidence over defense counsel's objection. Although the basis for the objection was not given and Judge Maguire failed to express the factual determinations upon which his decision was based, it appears from the record (223–228) that in passing on the objection Judge Maguire was concerned solely, or at least primarily, with whether Petitioner was properly advised of his rights. He concluded that Petitioner was properly advised of his rights. (225) However, in ruling on the objection, Judge Maguire characterized the warnings required by *Miranda* as:

[T]he right to remain silent, and any statement he may make, and does make, may be used against him in evidence and thirdly and very importantly, he is entitled to counsel, and if he

3. Note that at trial Petitioner denied that he was ever advised of any of his rights.

has no funds for counsel, it is the duty of the police to see that he gets counsel. (224).

The Judge plainly omitted the same right that Petitioner alleges was omitted from the warnings given him. From this incomplete statement [4] of *Miranda,* it is, at best, difficult to imply from Judge Maguire's admission of the statement into evidence that he found, as a matter of fact, that Petitioner was advised of his right to have counsel present at the time of the interrogation. In the absence of any findings of fact by the state court on which we can rely, we must, at this juncture, look to the cold record to evaluate Petitioner's claim.

Although Petitioner testified that he was not advised of his rights, it appears from the testimonies of Captain Cadden, who conducted the interrogation, Detective Sergeant Lewandowski, and Detective Craig that Cadden actually administered *Miranda* warnings to Petitioner several different times. There are, however, inconsistencies in their testimony as to the details of the warning. Following are summaries and excerpts of relevant portions of the trial transcript.

. . . . . .

Petitioner was initially interrogated by Captain Cadden from approximately 4:45 P.M. until approximately 6:00 P.M. on the day of his arrest. At approximately 8:00 P.M., roughly two hours after the first interrogation ended, at which nothing incriminating was elicited, Petitioner was placed in a line-up where he was identified as having been on Park Avenue on the night of the homicide. Apparently, as a result of these identifications, Petitioner became acutely upset and began to cry while standing in the line-up. As he was taken from the line-up room, still crying, he suddenly blurted out, "I didn't mean to kill her." Petitioner was immediately taken back to the interrogation room where, still emotionally distraught, he repeated this statement to

ter Petitioner made the detailed statement which was reduced to writing.

Captain Cadden testified that he advised Petitioner of his *Miranda* rights three times—once during the 4:45 P.M. session, a second time after Petitioner came out of the line-up and repeated his spontaneous statement, and a third time before Petitioner made his detailed statement. (108–109). With respect to the first warning, Captain Cadden testified:

Q. . . . Tell us exactly what you told the defendant.

A. Well, I told him that we were investigating the case of homicide and so forth, a woman that was found slain in her home. She had been sexually molested. *He had a right to remain silent. If he desired, he could get a lawyer of his own choosing. If he couldn't afford a lawyer, we were obliged to obtain a lawyer for him. He was advised that anything he said to us would be used against him in a Court of law.* We wanted to call his parents. . . . [Emphasis added].

Q. When you said he could have a lawyer, what type of response did you get?

A. We told him if he couldn't afford an attorney, we were obliged to get an attorney. *We showed him this piece of paper that we carry. We read it there.* Voluntariness of confession. Miranda v. State of Arizona. We are obliged to get him an attorney before proceeding. [Emphasis added].

Q. You gave that to him to read for himself?

A. Yes. (74–76).

The above testimony indicates that not only did Cadden orally advise Petitioner of his rights, but that he also gave Petitioner a *"Miranda* form" to read. The

---

4. See discussion of *Miranda* below.

paper referred to, admitted into evidence as State's Exhibit 3A,[5] is apparently a Police Department directive used to inform police officers of their duties under *Miranda*. At a later stage in the proceedings, while testifying as to the warnings he gave Petitioner following the line-up, and Petitioner's response thereto, Cadden made several references to the 4:45 P.M. interrogation and this form which suggest that Petitioner may not have read this sheet.

DIRECT:

Q. . . . What if anything, did Mr. Young say to you with regard to an attorney?

A. He told me that he didn't want an attorney at first. At first, he didn't do anything. After this line-up, when he made certain statements, I again admonished him that he may request a lawyer —I was quite emphatic. . . .

Q. When you say emphatic . . . .

A. Well he could call an attorney if he so desired. . . .

Q. What did he say to that?

A. He didn't want an attorney, he never accepted this or the response.

Q. What, if anything, did he say to you when you told him that whatever he said would be used against him in court?

A. He said he understood this. *I read him from the original sheet after I submitted it to him.* We explain to these people regardless. The people's intelligence must be considered. [Emphasis added].

Q. . . . You said that you showed the Defendant this and read it?

A. Yes. (111–112).

. . . . . .

Q. What was done with this after the Defendant read it?

A. Put it back on the desk as I recall.

Q. Did you hold it in your hand?

A. No, *I explained to him, showed to him, and he looked over at the desk like this. I asked him to pick it up and touch it and read it and he said that he didn't need a lawyer, didn't know anything at that time.* This was what he said. (113) [Emphasis added].

On cross examination Cadden was asked about the use of this sheet during the 4:45 P.M. interrogation:

CROSS:

Q. What did you do with the paper as far as the Defendant is concerned before questioning about 6:00 o'clock?

A. I explained his rights to him after he said he was in that area. I handed it over to him.

Q. What did he do?

A. *He looked at it in his hand. I don't know. I thought he just looked at it at the desk and handed it back* and I asked if he understood this. (115) [Emphasis added].

As to the post line-up warnings, Cadden testified that following the line-up he returned to the interrogation room where he was told that Petitioner had made an inculpatory statement. Find-

---

5. State's Exhibit 3A:

June 21, 1966

VOLUNTARINESS OF CONFESSIONS IN VIEW OF SUPREME COURT DECISION IN MIRANDA v. ARIZONA

In addition to the traditional tests of voluntariness, i.e., that statements of the defendant may not be the product of threats, coercion, duress, promise of reward or of any other improper inducements, *Miranda* requires that prior to any interrogation, persons "in custody" must be advised of the following: (1) "that he has the right to remain silent"; (2) "that anything he says can be used against him in a court of law"; (3) "that he has the right to the presence of an attorney," and (4) "that if he cannot afford an attorney, one will be appointed for him prior to any questioning, if he so desires."

ing Petitioner acutely upset, Cadden asked him what was the matter. When Petitioner repeated his statement ("I didn't mean to kill her."), Cadden advised him of his rights for a second time, and when Petitioner indicated a willingness to make a statement and began to make a statement, Cadden warned him for the third time. (106–110).

Q. What did you do?

A. I again admonished him as to his rights. I asked him if he wanted to call his parents. "Oh God, no, no." He was crying.

Q. You said you admonished him again.

A. Yes. . . .

Q. You are using the word again because of the prior interrogation?

A. Yes, I advised him, and told him he could remain silent. He didn't need to say anything further. He had a right to an attorney and we would get him an attorney if he had no means to obtain an attorney. He was told that whatever he said there was going to be used in Court and anything further that he said would be used against him in Court.

Q. What did he say to this?

A. He was crying very vigorously, "I swear to God I didn't mean to kill her." . . . we asked him if he desired to tell the story, if he desired to give a statement, and he said he did. He would tell the story.

Q. Do you recall what you said at this time?

A. I, again told him, did he want to give a statement and he said yes. At that time, we prepared a paper to put in the typewriter. We started in on our routine questions, name, age, extent of education, address, whether he could read or write, he began to relate the crime and I again admonished him as to his rights again. That

is in the statement. He told us that he wouldn't sign the thing. I remember that. (106–108).

. . . . . .

Q. Now did Mr. Young, in fact, give you a statement?

A. Yes, he did. He said he wanted to get it off his chest. He was upset. He was crying, shaken. When he started telling us, we advised him the first time after admonishing him as to his rights. (109).

At this point Captain Cadden read the warnings as they appeared in the typed statement:

[I] want to advise you as I have advised you before this afternoon that you do not have to say anything to us regarding this homicide. You do not have to discuss this at all with us. I want to further advise you that you do not have to give a statement or make any statements regarding this homicide unless you want to. You can remain silent if you wish to, you do not have to discuss this at all unless you wish to of your own free will. You have the right to talk to an attorney, a lawyer of your own choice, *before you say anything.* If you cannot afford an attorney, we are required to make arrangements for an attorney for you *before you say anything,* if you so desire. You must understand that anything you say may be used against you in a Court of law. . . . (110) [Emphasis added].

. . . . . .

Detective Sergeant Lewandowski also testified as to the warnings given Petitioner during the 4:45 P.M. interrogation. His version of these warnings, however, differs from Cadden's. When asked what Cadden said to Petitioner, Lewandowski replied:

A. He advised him that he did not have to say anything. That anything that he said would be held against him. That he could have an attorney present during this

interview and that he could conclude this interview at anytime. (92).

Moreover, Lewandowski testified that he did not remember Cadden showing Petitioner the *Miranda* form:

Q. Before he questioned him, did he show any paper?

. . . . .

A. No, sir, not to my knowledge.

Q. If he had shown any paper, would you have seen it?

A. He could have shown a paper and I don't remember. This happened in October.

Q. When he was advising him of his rights before he interrogated him about the homicide, did he show any paper at all?

A. Before he advised him of his rights?

Q. Yes.

A. Not to my knowledge. He advised him of his rights orally.

Q. No other way except orally?

A. Not to the best that I can remember. I remember him advising him orally. (98–99).

. . . . . .

Q. Well, the Lieutenant didn't show the defendant any piece of paper saying anything about his rights did he?

A. Not to the best of my knowledge. I didn't see him hand him anything. . . . (99–100).

. . . . . .

Q. Do you remember, and you were there during the entire verbal interrogation by Lt. Cadden weren't you?

A. Yes, I was.

Q. And it is simple language. Did Lt. Cadden hand William Young any piece of paper?

A. It's just like I told you. I don't remember him passing anything.

Q. If he had passed him anything, you would have seen it?

A. I may have seen it and forgot. (100–101).

Lewandowski gave no testimony regarding the post line-up warnings given Petitioner.

. . . . . .

The testimony of Detective Craig concerning the warnings given during the 4:45 P.M. interrogation differs from that of both Cadden and Lewandowski:

DIRECT:

Q. Would you briefly describe what constitutional rights Lt. Cadden advised Mr. Young of.

A. He advised Mr. Young *that he had a right to remain silent, not to answer any questions. He had a right to have a lawyer at his side. If he couldn't afford a lawyer, that the Police Department would make arrangements to supply him with one.* (208) [Emphasis added].

Craig testified, however, that Cadden showed Petitioner the *Miranda* form at that time.

Q. I show you State's Exhibit No. 3A, and ask if you can identify that?

A. Yes, this was shown to the Defendant here and given to him to read.

Q. During the 4:45 interrogation?

A. Yes sir.

Q. Who gave it to Mr. Young to read?

A. Lt. Cadden.

Q. Did you see him do that?

A. Yes I did. (208–209).

And on cross-examination, with respect to this form, Craig testified:

Q. Did you see William Young read it?

A. Yes sir. (213).

It should be noted that on cross-examination, when confronted with Lewandowski's testimony that he (Lewandowski) did not recall Cadden showing Petitioner any *Miranda* form. Craig at first insisted that Lewandowski was not

present at that time (213), then conceded that he didn't know whether Lewandowski was in the room or not (213) and finally admitted that Lewandowski could have possibly been in the room (214).

Finally, Craig's version of the post line-up warnings differs from that of Cadden. Craig testified when Petitioner made his inculpatory statement as he was leaving the line-up room, he was immediately returned to the interrogation room, where Captain Cadden was summoned and informed of the statement.

Q. What was the next thing that happened?

A. He was then again advised by Lt. Cadden of his rights.

Q. What rights?

A. *The same thing. He had a right to remain silent, not to talk about anything at all without a lawyer and he could be supplied with a lawyer.* (211) [Emphasis added].

Ignoring for the moment the use of the *Miranda* sheet, the above testimony clearly indicates that Cadden advised Petitioner of his "rights" three times. What is not clear however is the content of each set of warnings.

With respect to the first set of warnings, administered during the 4:45 P.M. interrogation, we have three accounts of the warnings given; each is different.

| CADDEN I | LEWANDOWSKI | CRAIG I |
|---|---|---|
| • right to remain silent | • did not have to say anything | • right to remain silent, need not answer any questions |
| • could get a lawyer of his own choosing | ——— | ——— |
| • if couldn't afford a lawyer police were obliged to obtain one for him | ——— | • if he couldn't afford a lawyer Police Department would make arrangements to supply one |
| • anything he said would be used against him | • anything he said would be used against him | ——— |
| ——— | • that he could have a lawyer present during this interview | • had a right to have an attorney at his side |
| ——— | • he could conclude the interview at anytime | ——— |

With respect to the post line-up warnings, Cadden testified that he advised Petitioner of his rights on two occasions following the line-up—once, after Petitioner repeated his earlier incriminating statement to Cadden and again when Petitioner made his detailed statement.

Both of these sets of warnings are essentially the same as the pre-line-up set testified to by Cadden. While Detective Craig did not indicate in his testimony how many post line-up warnings were given, his statement of the post line-up warnings is also consistent with his

pre-line-up version. Thus, there is a difference as to the content of the post line-up warnings as well as the pre-line-up warnings.

| CADDEN II | CADDEN III | CRAIG II |
|---|---|---|
| • he could remain silent. He didn't need to say anything further | • you do not have to say anything . . . you do not have to discuss this at all . . . you do not have to give a statement . . you can remain silent | • He had a right to remain silent |
| • he had a right to an attorney | • you have a right to talk to an attorney, a lawyer of your own choice before you say anything | ——— |
| • we would get an attorney if he had no means to obtain an attorney | • if you cannot afford an attorney, we are required to make arrangements for an attorney for you before you say anything | • he could be supplied with a lawyer |
| • whatever he said there was going to be used in court and anything further he said would be used against him in court | • anything you say may be used against you in a Court of law | ——— |
| ——— | ——— | • a right not to talk about anything at all without a lawyer |

———◆———

In attempting to reconcile these differences, it can be argued that Cadden's version is entitled to the most weight. Cadden actually conducted the interrogation and administered the warnings, and it therefore seems likely that his recollection of what happened might be better than that of either Lewandowski or Craig, who were just spectators. Moreover, both Lewandowski and Craig were uncertain about certain things in their testimony (Lewandowski as to the use of a *Miranda* form, and Craig as to Lewandowski's presence at the 4:45 P. M. interrogation), indicating that neither has a clear recollection as to all and exactly what occurred during the interrogation. Finally, it seems probable that Cadden, who was the only one who administered warnings to Petitioner, would give basically the same warnings each time. The only unimpeachable statement of any of the three sets of warnings we have is the statement which appears in Petitioner's typed confession. This statement contains essentially the same warnings that Cadden testified he gave Petitioner on the two prior occasions; more significantly it contains the same omission as to the two earlier sets—a statement of the right to "presence of" an attorney during the interrogation.

The first question is whether or not the totality of the foregoing meets with *Miranda* requirements. As summarized in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the required warnings are as follows. The person must be advised:

. . . that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. 384 U.S. at 479, 86 S.Ct. at 1630.

With respect to the right to have counsel present during interrogation the Court said:

The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process. A once-stated warning, delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowledge of their rights. . . . 384 U.S. at 469, 86 S.Ct. at 1625.

As to what is necessary effectively to convey the substance of the *Miranda* warnings, several of the courts have taken what appears to this Court to be hypertechnically narrow approaches.

In Lathers v. United States, 396 F.2d 524 (5 Cir. 1968), the court, although asserting that "there is no talismanic or heraldic abracadabra which must be fulfilled" (396 F.2d at 535), held that warning the accused that he could talk with an attorney and that if he was unable to hire one, the commissioner or court would appoint one, did not satisfy *Miranda*. The actual advice was:

. . . We told him he had every right to remain silent, entitled to counsel, or 'phone call to talk to anyone he wanted before talking to us. 396 F.2d at 533.

The interrogee stated that he did not want an attorney. The court concluded that the language used failed effectively to convey to the accused that he was entitled to government furnished counsel "here and now." While inveighing against the playing of word games with sentence syntax, the court went on to say:

. . . We must, however, be keenly aware of both semantics and the law of probabilities. Moreover, when the prerogative of obscurantism rests with the government, the burden falls squarely on the government's shoulders to prove an offer without equivocation or ambivalance. . . . The offering words must be so clear that they distill all doubt. *Lathers, supra*, 396 F.2d at 535.

The most extreme holding of which this Court is aware is that of United States v. Fox, 403 F.2d 97 (2 Cir. 1968). There the panel held 2–1 that the warning that the accused did not have to make any statement, that any statement he made could be used against him in a court of law, and that he could consult with a lawyer prior to any questioning, was defective on two grounds. First, the warning that he did not have to make any statement was not equivalent to telling him that he had a right to remain silent, in that the former could be interpreted to mean that he did not have to make a *formal* statement rather than that he did not have to answer any questions or say anything at all. Secondly, the court ruled that the warnings gave no indication that the accused was entitled to have an attorney present during questioning, although he was told that

"he could consult an attorney prior to any questioning." 403 F.2d at 100.

To this Court, the warning would seem to be sufficient at least to advise that the interrogee had the right to remain silent, and to consult an attorney before saying anything. If he had consulted an attorney, he almost surely would have been advised either not to talk, or not to talk unless his attorney was present.

This Court's reaction, expressed after reading the majority opinion, turned out to be exactly that of Circuit Judge Moore in dissent. He said:

> The majority, in holding that the words "he didn't have to make any statement" did not sufficiently warn of Fox's "right to remain silent," have to resort to the farfetched supposition that "statement" "could easily be interpreted to mean that Fox did not have to make a *formal* statement rather than that he need not answer any questions or say anything at all."

I cannot conceive that anyone, just having been arrested, when told that he did not have to make a statement would construe this warning as relieving him of an obligation to make a formal statement akin to a press release. Such a construction, in my opinion, is highly unrealistic. To give such talismanic significance to the words "the right to remain silent" is to preclude all other forms of expression which would convey the same idea. In *Miranda*, the Supreme Court clearly did not wish to prescribe such a strict formula. 384 U.S. at page 484, 86 S.Ct. at page 1633, the Court cited a letter from the Solicitor General which was "consistent with the procedure which we delineate today" in which the Solicitor General advised the Court that the FBI warned suspects that they had "a right to say nothing," citing as examples, Westover v. United States, 342 F.2d 684 (9 Cir. 1965), rev'd on other grounds, Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and, Jackson v. United States,

119 U.S.App.D.C. 100, 337 F.2d 136 (1964), cert. denied, 380 U.S. 935, 85 S.Ct. 944, 13 L.Ed.2d 822 (1965). In both those cases the language used was that the suspect "did not have to make a statement."

The second deviation found by the majority from their conception of *Miranda* standards is that Fox was only told that "he could consult an attorney prior to any question," whereas he should have been told that he had "the right to the presence of an attorney." But if he had the right to consult an attorney "prior to *any* question", the attorney could have prevented any interrogation without his being present —or any interrogation at all. 403 F. 2d at 104–105.

The Second Circuit has not been very happy with *Fox*. In United States v. Lamia, 429 F.2d 373 (2 Cir. 1970), cert. denied, 400 U.S. 907, 91 S.Ct. 150, 27 L. Ed.2d 146 (1970), the panel (of which Judge Friendly, one of the majority in *Fox*, was a member) seems to have reached diametrically opposite conclusions on these two points. The language is so significant and persuasive that a rather full quotation is justified. The court said:

> . . . We perceive no real distinction between advising a person that he has the right to make no statement and that he has the right to remain silent; they mean substantially the same thing to any reasonable person. While there may be philological distinctions, they surely would not occur to anyone at a time of arrest. Anyone hearing either phrase would conclude that he did not have to say anything. The court in *Miranda* nowhere prescribed the exact words which must be used under all circumstances. Indeed, the court seemed to equate the two phrases when it coupled its warning of the "right to remain silent" with the admonition that "any statement he does make may be used as evidence against him." 384 U.S. at 444, 86 S. Ct. at 1612. Nor do we believe that the court intended to limit the mean-

ing of the word "statement" only to a "formal utterance reduced to writing," whatever may be meant by such a term. The court did require that a defendant know that he need not say anything and that anything he did say could be used in court against him. Lamia was fully apprised of these rights; to hold otherwise would be to elevate form over any substance. There is no point in giving such significance to the phrase "right to remain silent" that all other forms of expression conveying the same idea are precluded. Furthermore, the court in its *Miranda* decisions indicated tacit approval of the language used by the FBI in its warnings. There the FBI warned, at the outset of an interview,

> "that he is not required to make a statement, that any statement may be used against him in court, that the individual may obtain the services of an attorney of his own choice, and, more recently, that he has a right to free counsel if he is unable to pay." 384 U.S. at 483, 86 S.Ct. at 1632.

There is no reason to believe that Lamia thought the phrase "need not make any statement" carried with it the meaning of a formal statement at a future court hearing. The warning was coupled with language of the present and contained phrases as "to us" and "at this time." Considering the words used in the circumstances of all that was said at the time, we find it to be a full and complete warning to Lamia that he need not make any statements to the officers present with him outside the bar. No purpose would be served by forbidding all questioning after an arrest unless a prescribed ritual is followed. It is enough that Lamia understood that he did not need to say anything and that he had a right to remain silent.

Lamia was also told that he had the "right to an attorney" and if he was not able to afford an attorney one would be appointed by the court. Lamia argues that this warning did not apprise him that he had the right to the "presence" of an attorney during questioning. We disagree. Lamia had been told without qualification that he had the right to an attorney and that one would be appointed if he could not afford one. Viewing this statement in context, Lamia having just been informed that he did not have to make any statement to the agents outside of the bar, Lamia was effectively warned that he need not make any statement until he had the advice of an attorney. 429 F.2d at 376–377.

*See also* Massimo v. United States, 463 F.2d 1171, 1173–1174 (2 Cir. 1972), cert. denied, 409 U.S. 1117, 93 S.Ct. 920, 34 L.Ed.2d 700 (1973) and United States v. Carneglia, 468 F.2d 1084, 1091 (2 Cir. 1972), cert. denied, 410 U.S. 945, 93 S. Ct. 1391, 35 L.Ed.2d 611 (1973).

The Supreme Court itself, in *Miranda,* recognized that the omission of advice that an interviewee was entitled to an attorney "here and now" was not to be shibboleth.[6] At pp. 483–484 of 384 U.S., at p. 1632 of 86 S.Ct., the Court said:

> Over the years the Federal Bureau of Investigation has compiled an exemplary record of effective law enforcement while advising any suspect or arrested person, at the outset of an interview, that he is not required to make a statement, that any statement may be used against him in court, that the individual may obtain the services of an attorney of his own choice and, more recently, that he has a right to free counsel if he is unable to pay. . . .

Despite the fact that no reference is made to the right to have counsel present during questioning, the Court held that "the present pattern of warnings and respect for the rights of the individual followed as a practice by the

6. Judges 12:6 (Bible, King James Version).

FBI *is consistent with the procedure which we delineate today.*" 384 U.S. at 483–484, 86 S.Ct. at 1633. [Emphasis added]. *See also* Evans v. Swenson, 332 F.Supp. 360, 366–367 (D.C.Mo.1971), aff'd, 455 F.2d 291 (8 Cir.), cert. denied, 408 U.S. 929, 92 S.Ct. 2508, 33 L. Ed.2d 342 (1972).

In Tasby v. United States, 451 F.2d 394 (8 Cir. 1971), cert. denied, 405 U.S. 992, 92 S.Ct. 1262, 31 L.Ed.2d 459 (1972); 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122 (1972), the court held that advising the appellant that "an attorney would be appointed "at the proper time" . . . even though a slight deviation" from *Miranda* did not negate the overall effectiveness of the warnings. 451 F.2d at 398–399. To the same effect see Klinger v. United States, 409 F.2d 299, 308 (8 Cir.), cert. denied, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969).

In United States v. Duke, 409 F.2d 669 (4 Cir. 1969), cert. denied, 397 U.S. 1062, 90 S.Ct. 1497, 25 L.Ed.2d 683, the court said:

. . . As long as the suspect is clearly told and clearly understands that he need not talk, that he may consult a lawyer before deciding whether or not to talk, and that he may have one present when he talks, if he decides to talk, *all of the requirements of Miranda are met.* . . . 409 F.2d at 670–671. [Emphasis added].

Despite the fact that these warnings did not include a warning that anything the appellant said could be used against him; that he could stop the interrogation at any time; and that if he were unable to employ an attorney one would be appointed for him, the court stated that "there was full compliance with *Miranda* requirements." 409 F.2d at 670.

In United States v. Hayes, 385 F.2d 375 (4 Cir. 1967), cert. denied, 390 U.S. 1006, 88 S.Ct. 1250, 20 L.Ed.2d 106 (1968), the warning given was:

. . . [T]hat he was not required to make any statements, that any statements he did make could be used against him in court, that he could have the services of a lawyer before making any statements, and that if he could not afford one, a lawyer would be retained for him. . . . 385 F.2d at 377.

Despite the absence of any direct statement that defendant was entitled to have a lawyer present during questioning, the court held that defendant "was *fully* advised of his constitutional rights." 385 F.2d 378. [Emphasis added].

Finally, in Wright v. State of North Carolina, 483 F.2d 405 (4 Cir. 1973), cert. denied, 415 U.S. 936, 94 S.Ct. 1452, 39 L.Ed.2d 494 (1974), the accused was given advice that he had a right to have an attorney with him "during questioning," and that he was entitled to the "advice and presence of a lawyer even if you cannot afford to hire one" and the further advice that:

. . . We have no way of giving you a lawyer, but one will be appointed for you if you wish, if and when you go to Court. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer. 483 F.2d at 410.

This Circuit held that under the totality, adequate *Miranda* warnings had been given.

This specific question is one on which there is an almost even split of authority,[7] and a strong argument can be made that the ordinary accused might well be confused as to the meaning of the warning that he was entitled to have an attorney with him during questioning and that one could be appointed for him, but not until he went into court; but that he could answer questions in advance of such appointment.

 This Court is of the opinion that Petitioner was sufficiently advised

---

7. *See* 94 S.Ct. 1452 nn. 1–4.

on his *Miranda* rights to make his admissions or confessions admissible.

(1) Although the oral testimony of Cadden, Lewandowski and Craig, taken independently, did not each contain all of the *Miranda* warnings, together they did, including the "here and now" right to counsel at any questioning. The trial in this case occurred shortly after the decision of *Miranda* and none of the witnesses, nor the court itself, had learned to memorize and recite verbatim the requirements thereof. While it may be argued that this same lack of letter-perfection may have occurred in the warnings given, it may at least as well, and this Court believes, be more persuasively argued that the totality of the testimony as to the warnings represents what was really told Petitioner. Certainly the totality would have been a complete compliance with the mandate of *Miranda*.

(2) The warnings, even if limited to Cadden's testimony, nevertheless adequately warned Petitioner of his right to remain silent; that anything that he said could be used against him; that he had a right to a lawyer, and that if he could not afford a lawyer, one would be appointed for him. This Court believes that the admonition of right to remain silent, that if he talked what he said could be used against him, and his right to counsel, adequately advised Petitioner of his right to have counsel "here and now," before and during any questioning. There was no limitation as to time of appointment; no postponement. He had an unqualified right to an attorney at any time; "here and now."

This Court is of the opinion that the failure to amplify the warning to include an express "here and now" is not fatal logically, especially in view of the Supreme Court's approval in *Miranda* itself of the FBI warnings that omitted these rubric words.

(3) There is another, independent but entirely satisfactory basis upon which the admission of homicide was proper. As has heretofore been noted, Petitioner, while leaving the line-up room, still crying, suddenly stated: "I didn't mean to kill her." [8] He was returned to the interrogation room, where he repeated this statement several times. The statement was not the result of, or in the course of, interrogation, but was volunteered. As such, it is admissible, apart from any warnings, or the accuracy thereof. As the Supreme Court said in *Miranda* (384 U.S. 436 at 478, 86 S. Ct. 1602 at 1630, 16 L.Ed.2d 694):

> In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding.

To the same effect are: United States v. Littlejohn, 441 F.2d 26 (10 Cir. 1971); Haire v. Saiver, 306 F.Supp. 1195 (E.D.Ark.1969), aff'd, 437 F.2d 1262 (8 Cir.), cert. denied, 404 U.S. 910, 92 S.Ct. 235, 30 L.Ed.2d 182 (1971); Payne v. United States, 409 F.2d 1350 (5 Cir. 1969); United States v. Godfrey, 409 F.2d 1338 (10 Cir. 1969); Anderson

---

8. Despite his representation by able counsel, Petitioner has several times written this Court expressing his willingness to plead guilty to manslaughter or second degree murder.

v. United States, 399 F.2d 753 (10 Cir. 1968); and O'Neal v. Swenson, 301 F. Supp. 1105 (W.D.Mo.1969). For cases where the confession was not during interrogation; United States v. Trosper, 450 F.2d 319 (5 Cir. 1971); United States v. McNeil, 140 U.S.App.D.C. 3, 433 F.2d 1109 (1969); Smith v. Peyton, 295 F.Supp. 1379 (W.D.Va.1968); Lamb v. Peyton, 273 F.Supp. 242 (W.D.Va. 1967). *See also*, United States v. Augello, 452 F.2d 1135, 1141 (2 Cir. 1971), cert. denied, 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122 and 409 U.S. 859, 93 S. Ct. 145, 34 L.Ed.2d 105 (1972); United States v. Barnes, 449 F.2d 1294 (9 Cir. 1971); Klamert v. Cupp, 437 F.2d 1153 (9 Cir. 1970).

## VOLUNTARINESS OF CONFESSION

Petitioner further attacks the voluntariness of his written confession. The record shows that at the time of the confession Petitioner was only nineteen years old and had had virtually no prior contact or involvement with the police.[9] A privately retained clinical psychologist testified at trial that Petitioner was "somewhat lacking in intelligence." More significantly, police testimony described Petitioner as "crying very vigorously" and "shaking and trembling, crying, and completely upset" at the time he gave the statement. Petitioner contends that the totality of these circumstances was so overbearing as to render his confession involuntary.[10]

Recently, in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court had occasion to discuss the concept of voluntariness as it has evolved in confession cases. There, the Court said:

"The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. *Is the confession the product of an essentially free and unconstrained choice by its maker?* If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." . . .

In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, . . . his lack of education, . . . or his low intelligence, . . . the lack of any advice to the accused of his con-

9. Petitioner had once been arrested for underage drinking.

10. In the memorandum accompanying his petition, Petitioner pointed out that he had made various assertions at trial which bear on the issue of voluntariness. As set forth in this Memorandum, Petitioner testified that he had not been advised of his rights, that he was not fed prior to the line-up and was not offered food until after the statement had been typed, that his oral admission that he "didn't mean to kill her" was given during interrogation and not spontaneously, that he had not been informed of the charges against him until after the line-up, and that after the statement had been typed he told the police it was untrue. All of these assertions were contradicted by police testimony. Petitioner also testified that the police told him he could go home if he made

a statement; this assertion was never specifically rebutted by the police witnesses.

While Petitioner noted these points in his memorandum and reserved the right to contest them at the hearing, he did not renew these allegations of police misconduct in his petition, but instead relied solely on the factors outlined in the text to establish his contention. Although the evidentiary portion of the hearing conducted by this Court was limited to the issues of legality of the arrest and competency of counsel, argument was permitted as to the remaining contentions and Petitioner did not at that time raise these points. Nor has Petitioner raised these allegations in any of the subsequent memoranda that he has filed in this Court. Since Petitioner has not placed these points in issue by renewing his allegations in these proceedings, this Court will consider his contention only in light of the allegations made herein.

stitutional rights, . . . the length of detention, . . . the repeated and prolonged nature of the questioning, . . . and the use of physical punishment such as the deprivation of food or sleep. . . . *In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted.* . . . 412 U.S. at 225–226, 93 S.Ct. at 2047 [Emphasis added; citations omitted].

As the above language clearly indicates, it is not the presence of one, or all, or some combination of the above factors which renders a confession involuntary; rather it is the effect or impact of these factors, where they are found to be present, upon the accused which is determinative. Thus this Court must look to the considerations cited by Petitioner and evaluate their influence upon him in order to determine whether the instant confession was "the product of an essentially free and unconstrained choice by its maker." *Schneckloth, supra,* at 225, 93 S.Ct. at 2047; *see also* Wright v. State of North Carolina, 483 F.2d 405 (4 Cir. 1973), cert. denied, 415 U.S. 936, 94 S.Ct. 1452, 39 L.Ed.2d 494 (1974).

Although Petitioner's youth requires that the record be scrutinized with special care, Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Thomas v. State of North Carolina, 447 F.2d 1320 (4 Cir. 1971); Williams v. Peyton, 404 F.2d 528 (4 Cir. 1968); youth by itself does not compel a finding of involuntariness, Williams v. Peyton, *supra*; Stokley v. State of Maryland, 301 F.Supp. 653 (D.Md.1969). This is particularly true where there is no suggestion that the police sought to take advantage of any youthful ignorance or naviete. Moreover, the facts that Petitioner initially denied any connection with the homicide and that even after he had given the statement still refused to sign it, clearly indicate that despite his youth and lack of experience, he was neither awed not intimated by the police.

It is also significant to note that this is not a case involving either a prolonged or incommunicado interrogation. *See* Brown v. Cox, 311 F.Supp. 81 (E.D. Va.1970). At the time of the confession Petitioner had been in custody for approximately four and a half hours during which time he was actually interrogated for little more than an hour. During the initial interrogation, which was conducted between 4:45 P.M. and 6:00 P.M., Petitioner made no statements. He was then placed in a cell where he remained until he took part in the line-up at approximagely 8:00 P.M. that evening. It was at the conclusion of the line-up, as he was being removed from the line-up room, that Petitioner made the statement that he didn't mean to kill "her." He was then immediately returned to the interrogation room, where, after a few minutes of questioning, he began to give his confession. It is clear that this statement was not the product of intensive questioning. Throughout this entire process Petitioner was repeatedly informed of his *Miranda* rights, including his right to have an. attorney (see discussion above). Moreover, Captain Cadden asked Petitioner several times whether he wished that his parents be notified. On each occasion Petitioner not only ask the police not to call his parents, but in Cadden's words, implored them not to contact his parents. When, after the confession had been reduced to writing, Petitioner indicated for the first time that he wished to speak to his father, his parents were immediately notified. Petitioner does not here allege that he was prevented from contacting either his parents or an attorney, and Captain Cadden's testimony indicates that had Petitioner requested either, the police would have immediately complied. To the extent that both his parents and an attorney were accessible to Petitioner had he so requested, his custody cannot be said to have been incommunicado.

*See* Redd v. Peyton, 303 F.Supp. 320 (W.D.Va.1969).

 Finally, this Court is not persuaded that Petitioner's mental and emotional state precluded a voluntary waiver of his rights. It is again to be emphasized that such factors are relevant only to the extent that they go to show a setting in which actual coercion might have existed. *See* Procunier v. Atchley, 400 U.S. 446, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971), reh. denied, 401 U.S. 966, 91 S.Ct. 966, 28 L.Ed.2d 249 (1971). They lose much of their significance where, as here, there is no proof or even allegation of intensive interrogation or proof of actual coercion. *See* Wright v. State of North Carolina, 483 F.2d 405 (4 Cir. 1973). Again, Petitioner has not alleged here that he was subject to force or threats of force, trickery or any other form of intimidating police conduct. Furthermore, while Petitioner's psychologist did describe Petitioner as "somewhat lacking in intelligence," this testimony must be considered in conjunction with Captain Cadden's testimony that he found Petitioner to be "reasonably intelligent" (128) and the trial court's finding that he was "a very observing young man." (224) Moreover, although Petitioner was acutely upset at the time he made the statement, his distress had not impaired his capacity so as to preclude him from giving a lucid and fairly detailed narrative respecting not only his activities on the night of the homicide, but events which had transpired some weeks earlier as well.[11] This fact, coupled with the exculpatory nature of his confession, strongly evidences the rational nature of Petitioner's statement. While this Court does not wish to speculate as to the motivation underlying Petitioner's confession, the words of Justice Frankfurter seem particularly pertinent:

> However, a confession made by a person in custody is not always the result of an overborne will. The police may be midwife to a declaration naturally born of remorse, or relief, or desperation, or calculation. Culombe v. Connecticut, 367 U.S. 568 at 576, 81 S.Ct. 1860 at 1864, 6 L.Ed.2d 1037 (1961).

This Court concludes that the circumstances herein alleged were not so overbearing as to render Petitioner's confession involuntary.

⋅ ⋅ ⋅ ⋅ ⋅ ⋅

 At trial Petitioner testified that the police had told him if he made a statement they would let him go (162). The State did not recall any of the officers who had previously testified as to the circumstances surrounding the confession or offer any other evidence to rebut this assertion. Petitioner contends that Maryland law, specifically Streams v. State, 238 Md. 278, 208 A.2d 614 (1965), required that such rebuttal evidence be introduced before his confession could properly be found to have been voluntary.

In *Streams*, the Maryland Court of Appeals held that the State had failed to establish the voluntariness of Streams' confessions where it did not produce evidence to rebut Streams' testimony that his confessions had been induced by threats and promises. At Streams' trial a Sergeant Tabeling, the sole police witness, testified that he had conducted all of the interrogations and that no threats or promises had been made. Thereafter Streams testified that the officers who had arrested him at his home and driven him to the police station told him they would take him home after he had answered some questions and that they had

---

11. In apparent anticipation of this point, Petitioner cites Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), in which the Supreme Court held that the probable truth or falsity of a confession was an impermissible standard by which to test voluntariness. This Court emphasizes that it is in no way considering the probable veracity of Petitioner's statement; it simply points out that the lucid and detailed character of the statement strongly militates against finding that it was the product of an impaired capacity or irrational mind.

questioned him during the trip to the stationhouse. Streams further testified that, in addition to Tabeling, another officer had been present at the interrogation sessions and that this second officer had told him that if he (Streams) made a statement they would try to get him probation, but otherwise they would "throw the book at him." The State did not recall Tabeling, nor did it call any of the other officers involved to rebut this testimony. On appeal the Maryland Court of Appeals held that while Tabeling's testimony might have been enough to establish the voluntariness of the confessions had it remained uncontradicted, in light of Streams' testimony and the fact that he had been in the custody of other officers who allegedly made statements to him and questioned him, it was insufficient. The court felt that in light of Streams' age and mental capacity (Streams was eighteen years old and a virtual illiterate) he could have easily interpreted the promise to take him home after questioning as meaning the sooner he talked the sooner he could go home, and that this belief could have been buttressed by the promise to help in getting probation if he gave a statement. The court also noted that the State had not specifically rebutted the alleged threat of a long sentence if Streams did not cooperate. The court therefore concluded that in failing to call any of the arresting officers or the officer who had allegedly threatened Streams, or to recall Tabeling to rebut Streams' allegations, the State had failed to establish the voluntariness of the confessions.

As noted above, this contention does not go to the voluntariness of Petitioner's confession; rather, Petitioner simply contends that as a matter of state law, the prosecution had to rebut his assertions of promises before his confession could be found voluntary. In other words Petitioner does not allege the violation of any specific federal constitutional right; rather the error alleged is one of state law and procedure. It is axiomatic that only the violation or denial of some federal constitutional right, and not alleged errors in the interpretation or application of state law, can be the basis for federal habeas corpus relief. "The role of a federal habeas corpus petition is not to serve as an additional appeal." Grundler v. State of North Carolina, 283 F.2d 798, 802 (4 Cir. 1960); Durham v. Paderick, 368 F. Supp. 342 (W.D.Va.1973).

Although the State did not specifically rebut Petitioner's assertion of police promises, the written confession contains an express statement that no threats or promises had been made with respect to the confession. Moreover, it is also clear that whether Petitioner's claim of promises is considered by itself or against a specific denial that any promises were made, the question of the presence or absence of such promises must ultimately reduce itself to a question of credibility to be resolved by the trier of fact. In this situation this Court sees little that could be added by a specific denial of promises. It is perhaps significant to note also that Petitioner has not renewed his allegations of promises here. Under these circumstances this Court finds no fundamental unfairness in the State's failure specifically to rebut Petitioner's testimony of promises, the only finding which would raise Petitioner's contention to constitutional dimensions.

### COMPETENCY OF COUNSEL

Petitioner finally contends that he was denied effective assistance of counsel due to the inadequacies of his privately retained attorneys, the late Michael Freedman and his son, Leonard Freedman.[12]

 The habeas petitioner who seeks to establish incompetency of counsel faces a difficult task; as announced in Root v. Cunningham, 344 F.2d 1 (4

12. It appears that while only Mr. Michael Freedman was retained to represent Petitioner, Mr. Leonard Freedman assisted his father both in the preparation of the case and at trial.

Cir.), cert. denied, 382 U.S. 866, 86 S.Ct 135, 15 L.Ed.2d 104 (1965), the standard to be applied is as follows:

> While a defendant is undeniably entitled to a fair trial . . . yet he is not guaranteed a perfect one. . . . Ordinarily one is deprived of effective assistance of counsel only in those extreme instances where the representation is so transparently inadequate as to make a farce of the trial. . . . This is especially true where, as here, the defendant chose and employed his own counsel. 344 F.2d at 3. [Citations omitted].

*See also,* Miller v. Cox, 457 F.2d 700 (4 Cir.), cert. denied, 409 U.S. 1007, 93 S. Ct. 433, 34 L.Ed.2d 299 (1972); Bennett v. State of Maryland, 425 F.2d 181 (4 Cir.), cert. denied, 400 U.S. 881, 91 S.Ct. 126, 27 L.Ed.2d 120 (1970); Brewer v. Peyton, 302 F.Supp. 740 (W.D.Va.1969), aff'd, 431 F.2d 1371 (4 Cir. 1970), cert. denied, 401 U.S. 994, 91 S.Ct. 1239, 28 L.Ed.2d 533 (1971).

Petitioner asserts that counsel failed to discover the names of the State's witnesses or interview them and failed to interview the defense witnesses. The record shows however that counsel had full access to the State's Attorney's file and were thus fully apprised as to the State's case, including its potential witnesses. These assertions were also contradicted at the evidentiary hearing before this Court by the testimony of Mr. Leonard Freedman. Although Mr. Freedman's recollection of the events which transpired some six years prior to the hearing was extremely vague, he did testify that his father had interviewed the State's witnesses, while he had interviewed the witnesses who appeared for the defense. In addition, there is nothing in the trial transcript to indicate that counsel were either surprised by or unprepared for any of the testimony presented at trial. Essentially it appears that this allegation is based on counsel's alleged failure to ascertain why two witnesses summoned by the State, a Mr. Frank Buchweich of 865 Park Avenue and a Mrs. Winifred Moore of 877 Park Avenue, did not appear at trial.

The decision as to whether a witness should testify is a matter of the attorney's judgment or a matter of trial tactics. "Trial tactics themselves do not constitute ineffective assistance of counsel." Lester v. Peyton, 303 F.Supp. 364, 368 (W.D.Va.1969). *See also,* Tolliver v. Slayton, 331 F.Supp. 174 (W.D.Va. 1971); Barham v. Cox, 312 F.Supp. 583 (E.D.Va.1970). While it is neither this Court's duty nor desire to second-guess an attorney as to his trial tactics, several considerations should be noted. With respect to the witness Buchweich, Petitioner makes no allegation as to what this witness would have testified or how his absence prejudiced Petitioner, other than to suggest that he might have been the Frank for whom Petitioner was searching on the night of the homicide. As previously noted counsel had access to the State's Attorney's file which contained *inter alia* the results of police interviews with potential witnesses. The report of the interview with Mr. Buchweich shows that he was unable to select Petitioner's photograph from among those submitted to him, indicating that he was not Petitioner's Frank. However, even assuming Mr. Buchweich to have been Frank, there are at least two factors, besides his failure to identify Petitioner, which suggest that he would not have been a favorable witness. First, according to Petitioner's confession, Frank had attempted to induce him into some sort of homosexual activity on their first meeting, suggesting that Frank would have been a reluctant witness. Secondly, Petitioner was unable to locate his Frank on the night of the homicide and that was the occasion of his sojourn through Park Avenue. Therefore, the most Frank could have done, had be testified, would be to explain Petitioner's initial presence on Park Avenue, and not his activities there.

The second witness of whose absence Petitioner complains, Mrs. Moore, lived on the third floor of the building in

which the homicide occurred. It appears from the report of one police interview with Mrs. Moore that between 10:00 P.M. and 11:30 P.M. on the night of the homicide she heard her doorbell ring and upon going to the second floor landing saw a man standing in the first floor hallway; she spoke briefly with the man, who told her he was looking for Frank. Although Petitioner contends that Mrs. Moore should have appeared at trial, on the theory that she could have testified that Petitioner was not the man in the hall, it appears that she too would have been of little aid to Petitioner's cause. According to Captain Cadden, Mrs. Moore was an aged and infirm woman who had refused to come to the line-up due to her illness. During another interview Mrs. Moore refused to look at photographs of suspects, refused to come to trial and told the police that she could not identify the man she had seen in the hall. It therefore appears that Mrs. Moore would have been, at best, a reluctant witness, and that the most counsel could have established, had she testified, was that she was unable to identify the man in the hall. Even more significant however is the fact that Mrs. Moore could have apparently testified that while standing on the second floor landing she spoke to a man standing in the first floor hallway who told her he was looking for Frank; had she so testified at trial, it would have corroborated a substantial portion of Petitioner's confession, thereby rendering Mrs. Moore a most damaging witness against Petitioner. Under these circumstances, this Court finds it difficult to criticize counsel for not pressing for the appearance of either Mr. Buchweich or Mrs. Moore at trial.

Petitioner also complains that counsel failed to introduce into evidence the results of certain physical tests conducted by the police. Following the homicide the police made a superficial and unsuccessful check of the deceased's apartment for fingerprints. It also appears that Petitioner was wearing the same clothes on the day of his arrest as he wore on the night of the homicide and that the police tested these clothes for the presence of blood and sperm; the results of the former tests were negative while the latter were positive. Petitioner contends that counsel should have affirmatively brought out these test results when the State failed to introduce them into evidence; and then have attempted to explain the positive results of the sperm test. Again this is a matter of trial tactics and again this Court has difficulty in criticizing counsel's judgment. The fact that the State conducted these tests, but did not introduce their results gives rise to the obvious inference that the results were unfavorable to the State. In the face of this obvious inference it would seem, at least to this Court, an undue risk for counsel affirmatively to have brought out the test results and then attempted satisfactorily to explain away the positive results of the sperm test.

Petitioner further asserts that counsel failed to make various arguments relating to the legality of his arrest, the voluntariness of his confession, and the adequacy of the *Miranda* warnings. At the time of Petitioner's trial the Maryland State Courts did not transcribe arguments and Mr. Freedman was unable to recall during his testimony before this Court the arguments which were made at trial. Therefore no direct evidence has been presented to this Court as to whether these arguments were in fact made. However, even assuming that these points were not considered, that fact, in the absence of any showing of prejudice, would not amount to incompetency of counsel.

"A prisoner is entitled to effective representation, but the fact that something which might have been done was not done, in the absence of a showing of any harmful consequences, is not enough to warrant overturning convictions on petitions for habeas corpus." Horne v. Peyton, 356 F.2d 631, 633 (4 Cir. 1966), [cert. denied,

385 U.S. 863, 87 S.Ct. 119, 17 L.Ed.2d 90 (1966)].

Wickline v. Slayton, 356 F.Supp. 140, 142 (E.D.Va.1973). The arguments posited by Petitioner here all go to the admissibility of his confession. Therefore, in order to establish his claim Petitioner would have to show that his confession should have been excluded regardless of his counsel's conduct. *See* Wickline v. Slayton, *supra*. This he has failed to do.

Petitioner also contends that counsel failed to confer sufficiently with him prior to trial or prepare him to testify. These allegations were contradicted however by the testimony before this Court. Mr. Freedman testified that he met several times before trial and fully discussed with Petitioner the ramifications of the case. Mr. Freedman further testified that the major decisions respecting the trial, such as whether it should be a court or jury trial and whether Petitioner should testify, were made only after full consultation with Petitioner. Moreover, while Petitioner's trial testimony does appear somewhat confused, there is no evidence, aside from Petitioner's assertion, that this resulted from inadequate preparation. Although Mr. Freedman's recollection of these events was poor, this Court finds him a credible witness, and in the absence of some evidence to the contrary (aside from Petitioner's allegation) cannot find that counsel were deficient in these matters.

 Petitioner also claims that counsel made no investigation of the facts of the case. Again, however, Petitioner has presented no evidence to support this claim and this Court finds nothing in the trial transcript which in-

dicates that counsel were unfamiliar with the facts. Petitioner also argues that counsel could have made strong arguments concerning the lack of fingerprint evidence, the lack of blood on Petitioner's clothing, the unlikelihood of Petitioner's returning to the scene of the crime, and the fact that while the evidence indicated that the deceased was killed by a blunt instrument, no such instrument was found. With respect to this argument, Petitioner apparently does not contend that these arguments were not made, but rather, that in view of Mr. Freedman's faulty recollection and the fact that argument was not transcribed, it is not known whether or not these points were raised.[13] A charge of ineffective representation by counsel should be sustained only where it appears clearly well grounded. Here, Petitioner has failed to support his allegations with evidence. Upon review of the entire record this Court is not persuaded that counsel's efforts were so inadequate as to render the trial a farce.

It would seem appropriate to note at this time that while testifying before this Court Petitioner stated that he was satisfied with his representation at these proceedings. This Court would also like to express its appreciation to Mr. Freedlander for his most vigorous efforts on Petitioner's behalf.

For the reasons hereinabove stated, the petition is dismissed.

Leave to proceed in forma pauperis has heretofore been granted.

The Clerk of the Court is directed to send a copy of this Memorandum Opinion and Order to the Petitioner, Mr. Barrett Freedlander and the Attorney General of Maryland.

13. With respect to this claim, Petitioner further argues that counsel's failure to maintain notes of his activities in preparation for trial and the State's failure to transcribe arguments operate to deprive him of a fair review of his trial, as it relates to competency of counsel. Admittedly, such records would have facilitated this Court's review of this contention. The issue of counsel's competency however is often a factual question, and as such it may be resolved in the same manner as other factual questions where the State court record is inadequate—by way of an evidentiary hearing. In the instant proceeding an evidentiary hearing was conducted on the issue of counsel's competency and Petitioner had full opportunity to present evidence to support his claim. Therefore, this Court does not believe that Petitioner was in any way prejudiced by the lack of records.